UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JOHN ERIC PARKS,

       Plaintiff,                           CIVIL NO. 09-3514 (PAM/JSM)

v.

                                  __REPORT AND RECOMMENDATION__

BECKY DOOLEY, SANDY O'HARA,
SGT. GERRY SPIESS, LT. PAUL
MICKELSON, ANGELA BRAUN,
DAVID HAGEMANN, TIM STROM,
DAVID MELDE,
CPT. BILL HENDRICKSON, and
SHERYL LILYA,

       Defendants.


JANIE S. MAYERON, United States Magistrate Judge


     Plaintiff John Eric Parks, a former Minnesota state prisoner, commenced this action seeking relief under 42 U.S.C. § 1983. See Complaint ¶¶1, 3 [Docket No. 1]. When Parks commenced this suit, he was confined at the Minnesota Correctional Facility - Moose Lake/Willow River ("MCF-ML/WR"). Parks was released on or about December 22, 2009. See Docket No. 7 (plaintiff's notice of change of address). As of the date of Parks' last filing in this matter, he was on supervised release. See Plaintiff's Response to Defendants' Motion to Dismiss or for Summary Judgment ("Pl. Resp."), p. 13 [Docket No. 17].

     This matter is now before the Court on defendants' Motion to Dismiss or for Summary Judgment, which defendants filed in lieu of answering the Complaint [Docket

No. 11]. [1]  This motion was referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that defendants' motion for Summary Judgment be granted in part and denied in part.

## I.   STANDARD OF REVIEW

Defendants moved to dismiss or in the alternative, for summary judgment.  As a general rule, materials outside the pleadings cannot be considered on a motion to dismiss, although a court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss.  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).  Here, both parties submitted materials outside of the pleadings for the Court's consideration.  Therefore, this Court analyzes defendants' motion under the standard of review applicable to a motion for summary judgment.  See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); see also McAuley v. Federal Ins. Co., 500 F.3d 784, 787 (8th Cir. 2007) ("We have previously held that 'Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion

---

[1]    On December 14, 2009, this Court recommended that plaintiff's claims against the Minnesota Department of Corrections ("MNDOC"), Dan Hilleren, Joan Fabian and Tom Koch be summarily dismissed pursuant to 28 U.S.C. § 1915A(b).  Report and Recommendation, December 14, 2009 [Docket No. 4].  On December 30, 2009, District Court Judge Paul A. Magnuson adopted the Report and Recommendation.  [Docket No. 9].

shall be treated as one for summary judgment and disposed of as provided in Rule 56.' Such 'matters outside the pleadings' include both statements of counsel at oral argument raising new facts not alleged in the pleadings, and 'any written or oral evidence in support of or in opposition to the pleading that provide some substantiation for and does not merely reiterate what is said in the pleadings.'" Gibb v. Scott, 958 F.2d 814, 816 (1992) (quoting 5C Wright & Miller, Federal Practice and Procedure § 1366)) (internal citations omitted).

Summary judgment is proper when, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing that there are no genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  If the moving party carries its burden, the nonmoving party must point to specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256.  The non-moving party must "substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l. Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## II.    FACTS[2]

Parks' suit arises from the ramifications that resulted from three incidents that took place in 2007, 2008 and 2009, including disciplinary measures taken against Parks arising out of these incidents.

### A.    2007 Disciplinary Incident

Parks was enrolled in the Challenge Incarceration Program (CIP) at MCF-ML/WR.[3]  In his sworn Complaint, Parks alleged that defendant Angela Braun, a CIP

---

[2]    The facts described in this Report and Recommendation derive from Parks' sworn Complaint (stating at page 7, "I certify, under penalty of perjury that the foregoing is true and correct."), the sworn affidavits and attached exhibits submitted by defendants (Affidavit of Kim Ebeling and Affidavit of Jeannie Lahood), and Parks' Response to Defendants' Motion and the Exhibits attached to this Response.  The Court recognizes that Parks' Response was not signed.  See Pl. Resp., p. 27.  However, at the end of the Response and immediately above the line for his signature, Parks stated "I swear under penalty of perjury that all statements contained herein are true and correct to the best of my knowledge."  Id.  This language comports with the requirements for submitting a sworn declaration pursuant to 28 U.S.C. §1746(2) ("I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.").  In light of Parks' pro se status and in the interests of justice, the Court has concluded it was an oversight that he did not sign the Response and has treated it as a sworn declaration.  See Holley Coal Co. v. Globe Indem. Co., 186 F.2d 291, 294 (4th Cir. 1951) (district court did not abuse its discretion in accepting an unsigned pleading, an unsigned pleading is not invalid); Santiago v. C.O. Campisi Shield No. 4592, 91 F. Supp. 2d 665, 671 (S.D.N.Y. 2000) (accepting pro se litigant's unsigned response to defendants' motion for summary judgment where "it would work an injustice to plaintiff to reject his opposition papers and grant defendants' motion as if unopposed.").

[3]    The Challenge Incarceration Program is a voluntary program for inmates who meet certain statutory and Minnesota Department of Corrections criteria. According to the Department of Corrections, "[o]ffenders are required to maintain a high level of program activity and discipline.  When they fail to do so, they are confronted and directed to conform to program expectations.  Failure to respond to directives is handled with immediate sanctions by staff.  Offenders may be removed from CIP and returned to a secure facility for medical, legal or disciplinary reasons."  See http://www.doc.state.mn.us/facilities/cip.htm.  The CIP has three phases.  During the first six-month phase, the offender is incarcerated and must complete an intensive treatment, work, and education program.  Minn. Stat. §244.172, sub. 1 (2009).  Phase two consists of six months of intensive supervision and surveillance.  Minn. Stat. §

drug and alcohol treatment counselor, filed a false disciplinary report against him. Complaint, ¶19.  The report followed shortly after an incident in which Parks claimed he had stayed after a classroom session with Braun to express his concern about the well-being of head psychologist, Snodgrass.  Id.  According to Parks, Snodgrass previously had collapsed in front of him and another prisoner.  Id.  The following Monday, Parks asked to speak to Braun, and then he told her what had occurred and asked that she speak to Snodgrass.  Id.  Parks indicated that Braun accused him of lying to get revenge on Snodgrass.  Id.  Three days later, Parks was interviewed by defendant Sgt. Gerry Spiess and Lt. Koch.  Id.  Despite giving direct answers, Lt. Koch told Parks that he was very skillful at eluding questions, and from that, Parks concluded that Spiess and Koch had an agenda.  Id.  In his Complaint, Parks described the encounter as follows:

> Angela Braun had filed a false disciplinary report, with their assistance, claiming that I had attempted to take her hostage by blocking the door and refusing to allow her to leave the room.  She claimed that I was screaming at the top of my lungs that "staff was on drugs."  She claimed that I told her that I was hearing voices and had shaved off my eyebrows because the rock band "Pink Floyd" had to me to.  She claimed that she was so afraid of me that she "almost went for her radio."  I told my interrogators that none of this was true, that the conversation between myself and Angela Braun had taken place in front of a video camera installed in the room.  I explained that at the end of the conversation, I asked her I could give her a hand and was asked to put the videocassette of the movie we'd just watched on the bookshelf in classroom 5.

Id.  In his Response, Parks gave this description of the incident:

> My conversation with Angela Braun was this:  "Ma'am, permission to speak, Ma'am."  "Ma'am, I wanted to ask you if you would talk to Mr. Snograss as a friend and coworker.  Last Friday he collapsed in front of

---

244.172, subd. 2 (2009).  In the final phase, offenders who have successfully completed Phases I and II are eligible for early, supervised release.  Minn. Stat. § 244.172, subd. 3 (2009).

> Mr. Pearson, and myself Ma'am.  As you've heard many times in class, many people think he is on drugs, but I think it may be something serious, he just went down."  At this point, Angela Braun, in the middle of picking up a stack of workbooks and homework assignments she had been grading, as well as her personal effects (coffee mug, keys, etc.) began yelling at me "Mr. Parks, if you are trying to get revenge on him for something, there is a grievance procedure to follow!" … I was quick to end this conversation that was suddenly calling into question my motive for trying to help someone, and seeing that her hands were full, asked I could give her a hand by returning the videocassette we'd just watched to it's (sic) proper shelf in another room.  She thanked me and said yes. … When a full three days had passed from the time Angela Braun and I spoke, I was taken from Parenting Class and interrogated by Sgt. Spiess and Lt. Koch.  Reading not from a properly filed discipline report, but what appeared to be a torn corner of a brown paper bag, they asked me first if I thought I was staff's friend and coworker, then suggested that my actions could be construed as attempting to take a female staff member hostage by refusing to allow her to leave the room … Then they then tried to make an issue of the fact that I'd trimmed by eyebrows.  Reading from the piece of brown paper bag, Lt. Koch quoted "Mr. Parks said that 'Pink Floyd told him to.'"

Pl. Resp., p. 2-3.  The reference to his eyebrows related to Parks' complaint that he had previously been singled out by officers and called "Sasquatch," "Bigfoot," "Yeti," and "Hunter-Gatherer," apparently because of his bushy eyebrows and hairy knuckles.  Id., pp. 3-4.  When he trimmed his eyebrows, he claimed:

> [I]t was all Angela Braun could talk about.  She laughed at me every time I raised my hand to join the conversations relating to our sobriety, and continuously interrupted me midsentence.  As I'd often written in my CD homework about being singled out by staff and referred to as a mythical animal by my peers, she knew all too well what I was referring to when, as she laughed and interrupted me once more, I'd had enough and said "Ma'am, yes Ma'am! Now instead of calling me Bigfoot, they tell me I look like the guy in the Pink Floyd video, 'The Wall'."

Id., p.4.

Parks claimed that before filing the false discipline report, Braun had also falsely accused him a plagiarizing from a novel in connection with a homework assignment, told him to "stop acting like a victim" when he disclosed in class that he was molested at

6

age six, and wrongly disciplined him for failing to do a homework assignment that he was not given because he was not in class that day.  Id.

Based on Braun's report, Parks was charged with violating the following Offender Discipline Regulations ("ODR"): failure to comply, abuse/harassment, and disorderly conduct.  See Affidavit of Jeannie Lahood in Support of Defendants' Motion to Dismiss or for Summary Judgment, ("Lahood Aff."), Ex. 1 (Notice of Violation issued by MCF-ML/WR dated December 7, 2007) [Docket No. 14].   In the Notice of Violation, Braun stated that when Parks reported for class, she noticed that he had no eyebrows, and when she questioned him about this, he stated he had shaved them off, having been influenced by "Pink Floyd's The Wall."  Id.  Parks lingered after class, closed the door and stood in front of it.  Id.  Braun stated that she "remember[ed] feeling uncomfortable when Parks closed the door and she "reached for [her] radio as [she] told him to speak."  Id.  Parks told Braun of the concerns he and others had regarding another staff member who they believed was on drugs.  Id.  Braun told Parks that if he wanted to make such an allegation, he should review the grievance procedure in the offender handbook and follow the chain of command.  Id.  Braun then told Parks to return to the barracks.  Id.

Parks claimed that the abuse and harassment charge was unwarranted, as he only "attempt[ed] to quietly ask for help for a state employee who had collapsed in front of [him]" and the disorderly conduct charge was "pulled out of thin air."  Pl Resp., p. 5.  Nevertheless, after being notified of his right to a hearing on the disciplinary charges, he waived a hearing and his right to appeal and pled guilty to all three charges.  Lahood Aff., Ex. 1, p. 2 (Waiver of Hearing, Plea of Guilty).  Parks pled guilty because defendant Spiess threatened him:

> [Spiess] told me that if I dared go to my disciplinary hearing, he would make sure I was found guilty and given six months in solitary confinement. He told me to sign the paper he offered … and I'd be released in five days. He said that either way I was kicked out of C.I.P.  I signed his paper demoralized and swayed by his coercion.  All I'd done is ask Angela Braun to talk to Mr. Snodgrass and see if he was alright.

Complaint, ¶19; see also Pl. Resp., p. 5 ("Sgt. Spiess told me I was out of boot camp regardless, and that if I chose to go to a hearing he would make sure I was found guilty of all the charges and given six months in solitary confinement.").

Parks was removed from the CIP and placed on five days of restrictive segregation.  Pl. Resp., pp. 5-6; Complaint, ¶24.  Parks claimed that he had six weeks left of an early release program that would have allowed him to go home two years before his scheduled release date.  Pl. Resp., p. 5.  As a consequence of being given five days solitary confinement, Parks alleged he lost his rights in the early release program.  Id., p. 5; Complaint, ¶24.

### B.   2008 Disciplinary Incident

After the 2007 disciplinary incident, Parks began to attend Bible study with defendant Chaplain David Hagemann and Hagemann offered Parks a job as his clerk. Complaint, ¶20; Pl. Resp., p. 6.  Parks worked for Hagemann for eight months.  Pl. Resp., p. 6.  During this time, Parks and Hagemann discussed such matters as religion, politics, government spy satellites, and World Trade Center conspiracy theories.  Id. Parks contended Hagemann gave him a book to read about the World Trade Center conspiracies, and that when Parks pointed out a "portion written by Senator [John] McCain … [that stated] that the 'people who believe the 9/11 conspiracy theories are the same kind of soft-minded people who believe in the Bible,'" Hagemann said that he agreed with that statement.  Id.  According to Parks, Hagemann "went on to tell [him]

that there was no such thing as the Garden of Eden, no such people as Adam and Eve, and that Sodom and Gomorrah weren't destroyed because their sins had reached heaven or that they had attempted to rape angles, but 'because they weren't very good hosts.'" Id.   Further, Parks stated that Hagemann repeatedly told members of his weekly Bible studies class that "the Bible said nothing bad about Homosexuality." Id. Parks indicated that "[o]ne day I'd heard enough.  I told him I could quote four or five Bible versus [sic] proving otherwise. … I concluded by summing it all up and saying "but I don't go to Bible study every week to listen to someone rewrite the word of God in a feeble attempt to justify his own lifestyle." Pl. Resp., pp. 6-7.

> Time went by and one day when I was working in the chapel, Chaplain Hagemann came into the office through the door coming from the staff break room.  As he walked past me, without any provocation or words exchanged, he shoved me through the door of the storage room.  I looked at him walking away and said "Excuse me, let me get out of your way!"  A couple of weeks later he shoved me into the wall next to his office door. On another occasion he asked Anthony Nelson, a new clerk that I'd been training, to perform a task on the clerk's computer.  After attempting to do the work, Anthony asked me to help.  I slid the keyboard over to the corner of the desk where I was standing, bent over.  As I was typing, Mr. Hagemann came up behind me and put his hand on my butt.  I immediately spun around and confronted him:  "that's sexual harassment!" He said that he had to go somewhere and left the room.

Id.; see also Complaint, ¶20.

Parks stated that the latter incident took place in Nelson's presence and in front of a security camera.  Complaint, ¶20.  Parks quit the job as Hagemann's clerk, got a job as an electrician in the prison maintenance department and took a class. Complaint, ¶20; Pl. Resp., p.7.  In the class, Parks did two assignments.  Pl. Resp., p.7. The first assignment involved answering the question "What kind of law would you like to see passed, and what would it look like?"  Id.  In response, Parks indicated members

of the Bush administration should be tried for having committed war crimes, and if they were found guilty, they should be hung. Id. Parks drew a gallows "with four stick figures hanging from it and named them "Dick, Donald, George and Condoleeza." Id., p. 8.

The second assignment involved answering the question "What I thought it would be like to be a clerk." Id. In response, Parks wrote "[i]n my experience you cannot bring your own expectations to the job. You will end up working for someone who neither represents God, nor the godly. And when he sexually harassed me (did I mention that he is an avowed homosexual?) I had to find another job." Id.

On September 26, 2008, Parks' teacher, Michelle Ostrander, read Parks' homework assignments. Lahood Aff., Ex. 2 (Notice of Violation dated October 13, 2008). Parks stated that when Ostrander read he had been sexually harassed by a prison employee, she planned on sending him to the prison psychologist to be interviewed. Pl. Resp., p. 8. Instead, Parks was arrested and taken into segregation where he was interviewed by defendant Tim Strom. Pl. Resp., p. 8; Complaint, ¶20

The interview with Strom was tape recorded. Pl. Resp., p. 8; Complaint, ¶20. According to Parks, in the interview Strom asked if Hagemann had simply been trying to get around Parks in the office. Pl. Resp., p. 9. Parks replied that "there was no room for two people in the doorway … and that even if [there] was, he didn't need to put his hand on my ass to get by." Id., p. 9. "Toward the end of the conversation Mr. Strom asked me if I felt disrespected. I thought: 'do I feel disrespected to for having my ass grabbed?' and told him yes." Id.

Parks was charged with abuse/harassment and threatening others.  Lahood Aff.,

Ex. 2 (Notice of Violation dated October 13, 2008).  In the Notice, Ostrander stated:

> On 9-26-08 I was reading homework assignments that offender John Parks, #180845, had turned in.  In one of his assignments on employability skills, he chose to write about the clerk position.  He used a narrative that accused David Hagemann of sexual harassment.  In another assignment he claimed that the president should be hung for war crimes.  Other assignments indicated drug use on the job, no fear, anger and recklessness.

Id.  Spiess delivered the Notice to Parks.  Id.

Parks alleged that Spiess, who Parks had previously claimed coerced him into

signing the guilty plea regarding the incident with Braun, again attempted to coerce him

into pleading guilty to the new charges, which Parks refused to do.  Pl. Resp., p. 9.

Parks also claims that he "requested multiple times to speak with Carlton County

officials to file charges of assault," and also for an attorney, but that Strom refused,

"saying 'nothing illegal took place.'"  Pl. Resp., p. 9; see also Complaint, ¶¶ 20, 25.

The matter proceeded to a hearing before defendant Paul Mickelson, a hearing

officer.  Lahood Aff., Ex. 2, p. 2 (Hearing Findings dated October 22, 2008).  Ostrander

was a witness at the hearing.  Id.  Mickelson concluded that the accusations against

Hagemann were unfounded and that Parks' continuing to make false accusations

against Hagemann constituted abuse/harassment.  Id.  In the section of the Hearing

Findings entitled "Hearing Narrative," Mickelson stated the following:

> On September 26, 2008 Michelle Ostrander Corrections Teaching Assistant, received a homework assignment from Offender Parks.  In the homework assignment, Parks accused the Chaplain of sexually harassing him while working as his clerk.  Parks wrote that the Chaplain was gay and that while working for him a person had to put up with his sexual harassment until you could find another job. The incident was investigated by OSI.  The charges were unfounded.  Offender Parks, during the hearing, stated that he was sexually abused by the Chaplain. OSI was

contacted, OSI stated that Parks, during the interview, said that Chaplain Hagemann did not sexually abuse him in any way.  According to OSI, Parks stated during his interview that the chaplain had brushed up against him without saying excuse me.  Parks told the interviewer that he felt disrespected by the Chaplain.  The Chaplains office is a place where offenders can attend to their spiritual needs.  Mr. Parks has made accusations of the Chaplain that are unfounded, even by his own admission.   Continuing to make false accusations meets the preponderance of evidence for Abuse Harassment.

Id.  Mickelson found Parks in violation of ODR 300 (abuse/harassment) and assigned Parks to 45 days segregation.  Id.  The charge of "threatening others" was dismissed. Id.

Parks disagreed with Mickelson's determination, claiming:

When I went to my hearing, Ted Mickelson stopped the recording and called Tim Strom.  He came back into the hearing room and told me that Tim Strom told him that I'd said "nothing happened."  I told him the entire interview was recorded.  I asked him to play the tape and show me where I'd said anything like that.  He told me "No, I'm not going to do that.  Tim Strom saying so is good enough for me."  Ted Mickelson, despite evidence to the contrary, found me guilty on both counts.  When I asked him how I had threatened anyone, he responded that I had "threatened the chaplain's employment," a complete reversal of what I had been charged with … in the first place.

Pl. Resp., p. 9; see also Complaint, ¶20 ("I was charged with Abuse/Harassment and was convicted because Paul Mickelson and Tim Strom, the investigator who'd conducted a recorded interview with me, claimed that during the interview, I had recanted.  I asked Mr. Mickelson to listen to the tape himself and point out where I'd recanted.  He refused.")

Parks appealed Mickelson's findings to defendant Associate Warden Becky Dooley.  Plaintiff's Exhibits ("Pl. Exs.") [Docket No. 18], p. 9. (Discipline Appeal, dated October 25, 2008).  Parks objected to Mickelson's acceptance of Strom's version of

Parks' statements during the investigation, rather than listening to the tape of the interview.  Id.  He claimed that:

> Lt. Mickelson's narrative attributes the statements made by the OSI interviewer to me.  He accepts heresay (sic) as fact and dismisses my testimony when it suits him.  OSI substitutes a misquoted interview with the victim with what should have been a thorough investigation.  To say that my accusations are unfounded is quite easy when OSI neglects to include witness testimony or videotaped evidence from the security camera installed where all three incidents took place.  These would surely be investigated if I were the one being investigated for sexual misconduct.

Id.

Dooley affirmed Mickelson's findings and denied Parks' appeal.  Lahood Aff., Ex. 2, p. 3; see also Pl. Exs., p. 8 (Memorandum dated July 2, 2009 from Sandra O'Hara, Associate Warden of Administration to John Parks affirming that Parks appealed the findings of the hearing officer "per policy.").  Dooley explained:

> I have reviewed the information and evidence you provided from the hearing on October 22, 2008.
>
> The testimony and evidence indicates that you were found guilty of violating ORD #300 Abuse/harassment.  The hearing officer did find the evidence supported the charges.  The hearing was conducted fairly.  You had the opportunity to present your case.  The penalties are within the guidelines for the rule violations.
>
> I find no compelling reason to overrule or modify the findings of the hearing officer or the penalty imposed.  Based on all of the information available, I affirm the decision made in this instance and your appeal is denied.

Lahood Aff., Ex. 2, p. 3.  Dooley did not listen to the audiocassette recording of Parks' interview with Strom or look at the video recording of the events in Hagemann's office.

Pl. Resp., p. 10.

C.    2009 Disciplinary Incident

After completing his time in restrictive segregation as a result of the 2008 disciplinary incident, Parks alleged that he stopped by defendant David Melde's desk on Sunday, February 14, 2009[4] to ask Melde if he would be released from room restriction status on President's day (imposed because Parks was not working at that point). Complaint, ¶21.  Melde told Parks:

> it would be a free day for everyone but me, and told me that he would send me to "the hole," referring to solitary confinement.  I responded that I had been behaving myself, to which he replied "I know, you are always well behaved.   But I can be real creative when writing discipline reports. But if we're going to do this I need to know. I need time to pack your property, and I want to be done by 10:00.  I don't need any overtime."  I told him "Staff must be required to take a class on writing 'creative discipline reports' before being allowed to work here at Moose Lake.  I just spent 76 days in 'the hole' because of somebody's 'creative discipline report.'"  He asked "76 days? What happened?"  When I told him about the Chaplain, he had me arrested for talking about it.

Complaint, ¶21.

As a result of this incident, Parks was charged with disobeying a direct order, lying and misrepresentation, abuse/harassment and disorderly conduct.   Lahood Aff., Ex. 3, p. 1 (Notice of Violation, dated February 19, 2009).   Parks claimed that the charges resulted from a false discipline report filed by defendants Melde and Sheryl Lilya, "stating that, among other things, I had 'approached the staff desk and begun to talk about it unprompted.'"  Complaint, ¶21; see also Pl. Resp., p. 10 ("Then he and Sheryl Lilya wrote a false discipline report claiming that I'd 'approached the staff desk

---

[4]    Plaintiff asserted that this incident took place on Sunday, February 14, 2009. Complaint, ¶21.   In 2009, February 14 fell on a Saturday.   The Notice of Violation indicates that the incident took place on February 15, 2009.  Lahood Aff., Ex. 3.

and began talking about it unprompted.'  I was arrested and taken to segregation …").

The Notice of Violation stated:

> Parks … came to U-35 staff desk and began talking about having his ass grabbed by "the Chapin" in October, 2008.  I asked if he was talking about the Chaplin (sic) and he identified Chaplin (sic) Hageman (sic).  Parks stated he was not supposed to talk about this with anyone.  It should be noted that Parks had been given a directive by OSI Strom that he should not discuss this situation with anyone.  Numerous offenders were in the area at this time.

Lahood Aff., Ex. 3, p.1.

A hearing was conducted before hearing officer Mickelson and Parks was found guilty of the charges.  Id., p. 2 (Hearing Findings).  The Hearing Findings indicated that Lilya and Melde appeared as witnesses and the evidence received was "Incident Reports, Prior Disciplinary History – Formal/Informal."  Id.  Mickelson did not provide any explanation for his findings in the report.  Id. (section entitled "Hearing Narrative" is blank).  Mickelson imposed a penalty of 60 days of segregation for lying and misrepresentation and 30 days of segregation for each of the other charges.  Id.; see also Lahood Aff., ¶5.[5]

Parks appealed Mickelson's findings.  Lahood Aff., ¶5.  Defendant Hendrickson stated he reviewed the information Parks provided in connection with the appeal, listened to an audio recording of the hearing, and reviewed the evidence.  See Lahood Aff., Ex. 3, p. 3 (Memorandum dated March 6, 2009 from Bill Hendrickson to Parks).  Hendrickson concluded:

---

[5]     The record is not clear on how much time Parks actually spent in segregation as a result of the 2009 disciplinary incident.  The Lahood Affidavit is silent as to whether the time ran concurrently or consecutively.  Parks says that "this time I spent 67 days in segregation, bringing the total to five months."  Complaint, ¶21.

The Hearing officer did find the evidence supported the charges. The hearing was conducted fairly. You had the opportunity to present your case. The penalties are within the guidelines for the rule violations.

I find no compelling reason to overrule or modify the findings of the hearing officer or the penalty imposed. Based upon all of the information available, I affirm the decision made in this instance and your appeal is denied.

Id.

Parks' version of the hearing and his appeal was as follows:

During my hearing I asked Lt. Mickelson if he intended to be impartial this time. He would not answer the question. He told me that the Chaplain did not do the things that I claimed he'd done because "the Chaplain said he didn't." I asked why nobody had talked to the witness, looked at the videotaped evidence[6] or listened to the audiocassette containing the interview where he and Tim Strom claimed I had recanted. He told me that I was not in charge of the investigation, and found me guilty of all charges. I appealed and Cpt. Bill Hendrickson upheld the findings, refusing to look at the videotaped evidence or listen to the audiocassette. He claimed I'd gotten a fair hearing.

Complaint, ¶21; see also Pl. Resp., p. 10.

### D.    **Inability to File "Incompatibilities"**

On April 16, 2009, Parks was notified that he was being transferred to another facility "because all this wrongful discipline had raised [his] custody points." Complaint, ¶22; Pl. Exs., p. 11. He claimed that while he was in segregation, he attempted to file "incompatibilities" against two offenders who had beaten him, and was refused the opportunity to do so. Complaint, ¶22 ("Tim Strom came to seg and told me that I would not be shipped out, but I'd better not talk about what happened with the Chaplain anymore. I was released to the general population the next day."). On April 16, 2009,

---

[6]    Parks' references to videotaped evidence and an audiocassette relate to the alleged incident involving Chaplain Hagemann in 2008.

Parks wrote a kite (a short note) reflecting his desire to register incompatibilities with inmates at Rush City and Stillwater, and asking that he not be sent to those facilities. Pl. Exs., p. 11.  Parks claimed that the MCL/ML-WR staff threatened to transfer him to "get [him] to remain silent about being assaulted by the Chaplain," because each time Parks attempted to file an incompatibility, he was told that he would "have nothing to worry about if [he] would stop talking about the incident."  Pl. Resp., p. 23; see also Complaint, ¶22 ("[I was told] by a lieutenant that I should just 'behave myself and not talk about the Chaplain and I'd have nothing to worry about.'").  Parks was not transferred; he was returned to the general population.  Complaint, ¶22; Pl. Exs., p. 11.

### E.  <u>Filing of Grievances</u>

In response to defendants' motion to dismiss or for summary judgment, Parks submitted a single grievance form as evidence that he had exhausted his administrative remedies.  Pl. Resp., p. 26; Pl. Exs., p. 1.  This form is dated July 14, 2009.  Pl. Exs., p. 1.  In this grievance, Parks complained of the "three separate occasions during [his] incarceration [when] staff have lied, misrepresented facts and enabled the discipline unit to file false charges against [him] to protect D.O.C. employees."  Id.  Parks claimed that he was the victim of MNDOC employees' "ma[d]e up stories … false charges ... threats and coercion" and that their behavior violated his "right to be protected from cruel and unusual punishment."  Id.  Parks attached a narrative to the grievance form describing in greater detail his complaints about how the 2007, 2008 and 2009 disciplinary incidents were handled.[7]  To a great extent, the allegations in Parks' Complaint repeat

---

[7]     The grievance stated that it included "twenty documents altogether."  Pl. Exs. P. 1.  This Court is unable to determine if the remaining 11 pages of the exhibits to Parks' Response, including the narrative, were part of the grievance.

the allegations in this narrative—that Angela Braun filed a false disciplinary complaint, Chaplain Hagemann shoved him and touched him on the buttocks, and the 2009 disciplinary incident was based on "false charges."  Id., pp. 2-3.  Parks alleged that he submitted a copy of this grievance to the Central Office because he feared "knowledge of the grievance being known at the Moose Lake Facility."  Pl. Resp.. p. 26.

On July 30, 2009, Kim Ebeling, grievance coordinator for the Central Office at MNDOC, rejected the grievance because, pursuant to MNDOC policy 303.100, "an offender grievance must be limited to current matters involving the offender filing the grievance."  Pl. Exs., p. 10.  Parks did not appeal Ebeling's denial of the grievance.

Parks also attached to his Response two kites directed to defendant Sandy O'Hara, Associate Warden, both dated June 28, 2009.  Pl. Exs. pp. 6, 7.  The kites reflected Parks' unhappiness with the outcome of 2007, 2008 and 2009 disciplinary incidents.  Id.  O'Hara's responded to the kites on July 2, 2009.  O'Hara stated:

> You address two different discipline issues stating that policy was not followed.  The first instance you site (sic) was in regards to your discipline at CIP. On December 7, 2007, you signed a waiver of hearing—plea of guilty…in accordance with established policy and procedure and information given to you by Sgt. Spiess, signing the waiver is admitting to the rule violations.  According to your file, you received a copy of your Notice of Violation, demonstrated by your signature on December 7, 2007. Signing the Waiver is admitting to a material violation which was explained to you by Sgt. Spiess when you plead (sic) guilty.
>
> In the second instance you elected to participate in a minor discipline hearing … Lt. Mickelson was the hearing officer.  Again per policy and which you quote in your kite "the hearing officer's decision will be based on information obtained in the investigation and the hearing process.  The hearing officer will use the preponderance standard for determining whether or not the offender violated the disciplinary regulation."  Per policy 300.010 preponderance standard is "evidence satisfying the hearing officer that a fact is more reasonable, more probable, and more credible than not." Lt. Mickelson found you in violation.  You then appealed the findings per policy.  Association Warden of Operations, Becky Dooley,

reviewed the findings and wrote: "I find no compelling reason to overrule or modify the findings of the hearing officer or the penalty imposed." You appealed this decision to Ms. Rish. She responded, "… I cannot overturn AWO Dooley's decision and it appears you have exhausted the discipline appeal process.

Upon review of your kite, policies and information on file, your discipline process was conducted within the scope of established policy and procedures. I agree with Ms. Rish in that your appeal was denied and will stand.

Pl. Exs., p. 8. Parks did not appeal O'Hara's response.

### F.   The Complaint

Parks' Complaint alleged the following claims: (1) defendants filed three false discipline reports against him, which resulted in Parks being placed in segregation and losing his place in the early release program (Complaint, ¶¶19, 20, 21); (2) defendants denied Plaintiff access to Carlton County officials in connection with the 2008 disciplinary incident (Complaint, ¶20); (3) Parks was prevented from filing "incompatibilities" when he learned he was being transferred to another facility (Complaint, ¶22); and (4) defendants' actions:

[h]ave shown a blatant disregard for Plaintiff's rights. Staff have refused to allow Plaintiff to live in a safe environment. These incidents continue to have serious ramifications. These actions by staff have resulted in misrepresentation, malicious prosecution, wrongful program termination, false imprisonment and intentional cover-up. These actions by staff have caused two years of extended incarceration and lost wages, the loss of eligibility for any other early release program, ineligibility for work release, ineligibility for transfer to a minimum security prison, and increased custody points. These actions by staff have caused physical and sexual assault, mental and emotional injury and marriage problems. These actions constitute a violation of Plaintiff's rights, including the right to free speech, the right to equal protection under the law and the right to be protected from cruel and unusual punishment. Also the right to due process and defamation of character.

Complaint, ¶27.

Parks also asserted that because of the false disciplinary actions taken against him, he was "no longer allowed to participate in educational programming, where I was maintaining an 'A' average, I was no longer qualified for any other early-release programming or work release, or transfer to a minimum custody prison."  Complaint, ¶22.

Parks sought relief under 42 U.S.C. §1983 to redress the deprivation of rights secured by the Constitution of the United States, and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.  Id., ¶1.  Parks sued the named defendants in their official and individual capacities.  Id., ¶18.

In his response to defendants' motion to dismiss or for summary judgment, Parks included the following chart setting forth the constitutional claims he was making against each of the defendants:

| Defendant | Action | Constitutional Amend. Violated |
|---|---|---|
| Angela Braun | Filed a false Report | 1st, 8th, 14th |
| Gerry Spiess | Coercion to plead guilty | 1st, 8th, 14th |
| David Hagemann | Assaulted in retaliation | 1st, 8th |
| Tim Strom | Gave false statements, misled investigation, coercion | 8th, 14th |
| David Melde | Filed a false Report | 1st, 8th, 14th |
| Sheryl Lilya | Filed a false Report | 1st, 8th, 14th |
| Paul Mickelson | Not impartial during hearings | 8th, 14th |
| Becky Dooley | Refused to consider evidence during appeal | 8th, 14th |
| Bill Hendrickson | Refused to consider evidence during appeal | 8th, 14th |

| Sandy O'Hara | Refused to consider evidence during informal grievance | 8th, 14th |

Pl. Resp., p. 15. As to Parks' remaining claims, defendants characterized them as state-law claims of misrepresentation, malicious prosecution, false imprisonment, and defamation. Parks agreed, as evidenced by his response to defendants' motion to dispose of these claims. Id., pp. 24-26.

Parks sought a declaratory judgment that defendants violated his constitutional rights and compensatory damages of $100,000 each against defendants Spiess and Braun, punitive damages of $150,000 each against defendants Dooley, O'Hara, Spiess, Braun, Hagemann, Strom, Melde, Hendrickson and Lilya, and punitive damages of $300,000 against Mickelson.[8] (Complaint, ¶¶ 29-35).

In his response to defendants' motion, Parks conceded that he was not pursuing a separate claim that defendants denied him access to Carlton County officials in connection with the 2008 disciplinary incident (Complaint, ¶20), or a separate "incompatibilities" claim under the Eighth Amendment (Complaint, ¶22). Pl. Resp., p. 23.

## III. DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Defendants argued that dismissal or summary judgment was appropriate because: (1) defendants were immune from suit pursuant to the Eleventh Amendment; (2) Parks' request for declaratory relief was moot; (3) Parks' claim for damages predicated on his unlawful imprisonment is barred by Heck v. Humphrey, 512 U.S. 477

---

[8] Plaintiff originally sought $2,250,000 in damages. Complaint, ¶¶30-35. With the dismissal of the Minnesota Department of Corrections, Hilleren, Koch and Fabian as defendants, Plaintiff's claim for monetary damages against those defendants is moot.

(1994);[9] (4) the Prison Litigation Reform Act ("PLRA") bars Parks' claims for mental and emotional damages where Parks has alleged no physical injury; (5) Parks failed to state viable claims under First Amendment, the Eighth Amendment, the Equal Protection and Due Process clauses of the Fourteenth Amendment, and pursuant to 42 U.S.C. § 1985; (6) all defendants were entitled to qualified immunity; (7) Parks failed to allege facts sufficient to sustain his state-law claims of defamation, malicious prosecution, false imprisonment and misrepresentation; (8) Parks' state law defamation claim was time-

---

[9]     Parks alleged that his removal from the CIP has caused two additional years of incarceration.  Complaint, ¶27; Pl. Resp., p. 13.  Parks also asserted that because of the false disciplinary actions taken against him, he "no longer qualified for any other early-release programming or work release."  Complaint, ¶¶22, 27.  Defendants argued that to the extent that Parks was suggesting that his sentence was unlawfully extended, that claim is precluded by the doctrine set forth in Heck v. Humphrey, 512 U.S. 477 (1994).  Def. Mem., pp. 5-6.  In Heck, the Supreme Court held that "[t]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid … a [42 U.S.C.] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87.  A prisoner is barred from bringing a civil rights action to challenge the fact or duration of his incarceration.  Id. at 483 (citing Preiser v. Rodriguez, 411 U.S. 475, 488-90 (1973)).  A prisoner cannot bring a suit that would "call into question the lawfulness of [his] conviction or confinement." Id.  In a civil rights action, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  Id. at 487.  The Heck doctrine applies to cases in which the plaintiff is no longer in custody.  See Entzi v. Redmann, 485 F.3d 998, 1003 (8th Cir. 2007).

    In response to defendants' argument, Parks stated that he had been sentenced to 56 months in prison, and he was not contesting the length of this sentence.  Pl. Resp., p. 13.  Rather, it was his contention that if he had been allowed to complete the six-month CIP, he would have been allowed to go home where he would have remained under the jurisdiction of MNDOC for the remainder of his 56-month sentence.  Id. Instead, he claimed that because defendants' wrongful actions caused him to be terminated from the CIP program, he was required to spend the balance of his sentence (2 years) in prison.  Id.  Based Parks' concession that he was not challenging the length of his sentence, the Court finds there is no basis to apply the Heck doctrine to his claim.

barred by the applicable statute of limitations; and (9) Parks failed to exhaust his administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a).   <u>See</u> Defendants' Memorandum of Law in Support of Motion to Dismiss or for Summary Judgment ("Def. Mem.") [Docket No. 12], pp. 4-24.

Parks took issue with all of defendants' contentions and submitted that their motion should be denied.

## IV.   DISCUSSION

For the reasons set out in detail below, this Court has determined that the Eleventh Amendment bars any claims for damages against defendants in their official capacity, Parks' request for declaratory relief is moot, and the PLRA bars Parks' claims for mental and emotional damages against defendants in their individual capacities where Parks has alleged no physical injury.   The Court has further concluded that Parks' claims against Braun (for filing a false report), against Spiess (for coercion), against Hagemann (for assault), against Strom, Melde and Lilya (for filing false disciplinary reports and presenting false evidence in disciplinary hearings), and against O'Hara (for failing to consider evidence during an informal grievance) are barred by Parks' failure to exhaust administrative remedies.

As to those claims that are not barred for failure to exhaust administrative remedies (the disciplinary proceedings and outcomes from these proceedings arising out of the 2008 and 2009 incidents), the Court finds defendants should be granted summary judgment on all claims relating to these proceedings asserted under the Eighth Amendment, Fourteenth Amendment, 42 U.S.C. §§1983 and 1985 and under state law.   However, as to Parks' First Amendment retaliation claims, this Court

recommends denying defendants' motion as it relates to the hearings and discipline inflicted on Parks stemming from the 2008 and 2009 incidents.

A.   **Eleventh Amendment Bars Claims for Damages Against Defendants in Their Official Capacities**

The Eleventh Amendment states that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State."   Under the Eleventh Amendment, federal courts lack subject matter jurisdiction over a claim against a state for damages when that state has not consented to the suit.  See Kimmel v. Florida Bd. of Regents, 528 U.S. 62, 72 (2000); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 64-65 (1996).  When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction.  Seminole Tribe, 517 U.S. at 64-65.

Eleventh Amendment immunity also extends to state officials, since "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citations omitted).  See also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (Eleventh Amendment immunity extends to state officials when the "state is the real, substantial party in interest.") (internal quotation omitted); Treleven v. University of Minn., 73 F.3d 816, 818 (8th Cir. 1996) (official capacity lawsuits are "essentially 'for the recovery of money from the state.'") (quoting Ford Motor Co. v. Department of the Treasury, 323 U.S. 459, 464 (1945)).[10]

---

[10]     The Eleventh Amendment does not bar suits against state officials acting in their official capacities for prospective, injunctive relief "to prevent future violations of federal

Minnesota has not waived its immunity from §1983 claims.  Phillips v. Minnesota State Univ., Civ. No. 09-1659 (DSD/FLN), 2009 WL 5103233 *2 (D. Minn. 2009). It is also undisputed that the State of Minnesota has not consented to suit.  See DeGidio v. Perpich, 612 F. Supp. 1383, 1388-89 (D. Minn. 1985) (recognizing that the State of Minnesota's limited waiver of sovereign immunity from tort actions in state court is not a waiver of Eleventh Amendment immunity from suit in federal court for federal constitutional claims).  In addition, it is well-established that Congress did not abrogate the states' immunity by enacting 42 U.S.C. §1983.  See Quern v. Jordan, 440 U.S. 332, 344 (1979). "This constitutional bar applies with equal force to pendent state law claims."  Cooper v. St. Cloud State Univ., 226 F.3d 964, 968 (8th Cir. 2000).

For all of these reasons, defendants are entitled to summary judgment on Parks' claims against the MNDOC defendants acting in their official capacities.

### B.   Request for Declaratory Relief is Moot

Parks seeks a declaratory judgment that the acts described in his Complaint violated his rights under the Constitution and laws of the United States.  Complaint, ¶29. A federal court lacks authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (citing Mills v. Green, 159 U.S. 651, 653 (1895)).  An inmate's claim for

---

law."  Treleven, 73 F.3d at 819 (citing Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995)).  Further, "state officials are 'persons' under §1983 when sued for injunctive relief because such actions are not treated as actions against the State."  Id. (internal citations and quotation marks omitted).  Here, Parks did not sue the MNDOC defendants for injunctive relief.  He only sought a declaratory judgment that their past actions violated his rights under the Constitution and laws of the United States.  Complaint, ¶29.

declaratory relief is moot when he is no longer subject to the conditions that gave rise to his claim.  See Senty-Haugen v. Goodno, 462 F.3d 876, 889 (8th Cir. 2006) (rejecting offender's claim for declaratory relief regarding his placement in isolation as moot after offender was removed from isolation); Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (dismissing as moot a prisoner's First Amendment claim for declaratory relief when he was transferred to a different prison); Hickman v. Missouri, 144 F.3d 1141, 1142 (8th Cir. 1998) (§1983 claims for injunctive relief based on prison conditions are rendered moot by inmate-plaintiff's release from prison);  Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner's claim for declaratory relief moot when he was transferred to another prison).  Parks has been released from prison.  The fact that he is on parole and could be sent back to "the authority of these very same officers," (Pl. Resp., p. 13), is insufficient to revive a claim that was rendered moot by his release. Therefore, the defendants are entitled to summary judgment on Parks' claim for declaratory relief.

### C.    PLRA Bars Claims for Mental and Emotional Damages

Parks has sued the MNDOC defendants for "mental and emotional injury." Complaint, ¶27.  In his claim for relief, Parks asked for compensatory damages of $100,000 against each of the MNDOC defendants and punitive damages of $150,000 against each defendant, except Mickelson, against whom he is seeking $300,000 in punitive damages.[11]  He has not described how he calculated these amounts, or what

---

[11]    "Proof of actual damages is unnecessary to establish a constitutional violation …" Bolin v. Black, 875 F.2d 1343, 1350 (8th Cir. 1989), cert. denied, 493 U.S. 993 (1989). When an inmate seeks to "vindicate constitutional rights whose deprivation has not caused an actual, provable injury," nominal damages may be appropriate.  Corpus v. Bennett, 430 F.3d 912, 916 (8th Cir. 2005) (quoting Wescott v. Crinklaw, 133 F.3d 658,

portion of the amounts sought relate to his claim for mental and emotional damages. Complaint, ¶¶30-35.   However, as he has not alleged any physical injury to his person,[12] to the extent that these damages may relate to his claim for mental or emotional damage, those claims must be dismissed. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C.§1997e(e) precludes claims for damages brought by prisoners for emotional distress without a prior showing of physical injury.[13]  See Royal v. Kautzky, 375 F.3d 720, 722-23 (8th Cir. 2004); Smith v. Moody, 175 F.3d 1025 (8th Cir. 1999) (affirming dismissal of prisoner's complaint because he did not allege physical injury); King v. Dingle, 702 F. Supp. 2d 1049, 1074 (D. Minn. 2010) (granting warden and prison officials summary judgment on prisoner's claim for damages for mental and emotional suffering because he could not prove physical injury under the PLRA).

---

662 (8th Cir. 1998)); see also Risdal v. Halford, 209 F.3d 1071, 1073 (8th Cir. 2000) (instructing the district court to award one dollar in nominal damages were a found for the §1983 plaintiff but found no actual damages).  Punitive damages are also allowed as a means to redress constitutional violations.  Royal v. Kautzky, 375 F.3d 720, 722-23 (8th Cir. 2004).  Damages on Parks' surviving claims, if any, must be decided at a later date.

[12]     Parks appeared to argue that his allegation that Hagemann pushed and shoved him fulfilled the statute's requirement to show physical injury,  Pl. Resp., p. 13.  In support of this position, Parks misrepresented the defendants' position on this issue when he states "The PLRA does not bar my claims.  The Defendants claim that I did not first claim any physical injury, and then go on to state that I was shoved and sexually assaulted."  Pl. Resp., p. 13.  What defendants actually stated was that "Parks did not allege that he incurred any physical injury.  He alleged that he was shoved and the chaplain touched him on the buttocks, but he did not assert that he was physically injured as a result of either alleged interaction."  Def. Mem., p. 7 (emphasis added).

[13]     Section 1997e(e) states: "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

This Court agrees with the defendants that Parks has failed to present any facts regarding physical injury that would preclude summary judgment on his claim for mental and emotional suffering. On this basis, summary judgment on any claim for such damages should be granted.

### D.    Failure to Exhaust Administrative Remedies

42 U.S.C. §1997e(a), which was enacted in 1996 as part of the PLRA provides:

> No action shall be brought with respect to prison conditions[14] under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This statute requires that prisoners must exhaust all of their available administrative remedies before they can bring a civil rights action based on the conditions of their imprisonment. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes…." Porter v. Nussle, 534 U.S. 516, 532 (2002). This is true regardless of the nature of the claim or the relief the prisoner is seeking. Booth v. Churner, 532 U.S. 731, 741 (2001).

---

[14]    The Eighth Circuit has stated that the term "prison conditions" used within 42 U.S.C. § 1997e(a) is defined in 18 U.S.C. § 3626(g)(2), as follows:

> [T]he term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2) (emphasis added). See Castano v. Nebraska Dept. of Corrs., 201 F.3d 1023, 1024 n. 2 (8th Cir. 2000).

Exhaustion under the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. 81, 90-91 (2006) (emphasis added). In other words, "proper exhaustion" of administrative remedies, "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (quotation and marks omitted). Woodford stands for the proposition that the exhaustion requirement may not be satisfied by filing an untimely grievance or otherwise procedurally defective appeal. See Woodford, 548 U.S. at 92-93.

As to the purpose of this requirement, the Eighth Circuit has explained:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might filter out some frivolous claims. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); see also Woodford, 548 U.S. at 89 ("Exhaustion of administrative remedies serves two main purposes. First, exhaustion protects 'administrative agency authority.' Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's]

procedures.' Second, exhaustion promotes efficiency.") (quotation and citations omitted); Alexander v. Hawk, 159 F.3d 1321, 1324 (11th Cir. 1998) (quoting 141 Cong. Rec. H1472-06, *H1480 (daily ed. Feb. 9, 1995)) ("Congress intended section 1997e(a) to 'curtail the ability of prisoners to bring frivolous and malicious lawsuits by forcing prisoners to exhaust all administrative remedies before bringing suit in Federal court.'"). Under the PLRA, failure to exhaust the available administrative remedies is an affirmative defense, with the burden of proof falling on defendant. Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007) (citing Jones v. Bock, 549 U.S. 199 (2007)); see also Nixon v. Sanders, 243 Fed. Appx. 197, 199 (8th Cir. 2007).

If it is established that administrative remedies were not exhausted before the prisoner files suit, dismissal as to those claims subject to exhaustion is mandatory. Jones, 549 U.S. at 211 ("[t]here is no question that exhaustion [of administrative remedies] is mandatory under the PLRA and that unexhausted claims cannot be brought in court"); Woodford, 548 U.S. at 85 ("[e]xhaustion is no longer left to the discretion of the district court, but is mandatory"); Johnson, 340 F.3d at 627-28 (finding that if a prisoner does not exhaust his administrative remedies before filing a complaint in federal court, "dismissal is mandatory," and even if a prisoner subsequently satisfies the exhaustion requirement while his action is still pending, the case still must be dismissed).

Inmates are excused from complying with an institution's grievance proceedings in two circumstances: "when prison officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance

procedures." Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005) (internal citations omitted).

The grievance procedure adopted by MNDOC describes the administrative remedies available to Minnesota state prison inmates. See Affidavit of Kim Ebeling ("Ebeling Aff.") [Docket No. 13], Exhibit 1 (Grievance Procedure, MNDOC Policy No. 303.100, effective date June 2, 2009).[15]  Pursuant to the policy, inmates must first seek to resolve their grievances informally, by sending a kite to a pertinent prison staff member. Id. If the kite does not resolve the grievance to the inmate's satisfaction, then the inmate may prepare and submit a formal "Offender Grievance form" to the "facility grievance coordinator," and attach all kites used Id., p. 2.  The grievance form must be filed within 30 calendar days of the occurrence of the issue being grieved. Id.  The offender is to identify a single complaint and the resolution he/she seeks on the grievance form. Id.   The formal grievance is investigated by the facility grievance coordinator, who submits the results of his or her investigation to the prison warden/superintendent or designee. Id. The warden/superintendent (or designee) then rules on the grievance, and the facility grievance coordinator provides written notification to the offender of the warden/superintendent's (or designee's) decision within 20 working days from the date the grievance was logged into the grievance database. Id.  The warden/superintendent (or designee) may obtain a one-time 20-working day extension provided the offender is notified of the extension within the first

---

[15]     Kim Ebeling, an Office and Administrative Specialist Senior with the Policy and Legal Services Division of the Minnesota Department of Corrections, stated that the "requirement to file a grievance appeal is the same as it was in earlier versions of the policy." Ebeling Aff., ¶2.  Parks has not disputed that the grievance policy attached to Ebling's affidavit governed the 2007, 2008 and 2009 disciplinary actions.

20 working days. <u>Id</u>. If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received notice of an extension, the offender may consider the grievance dismissed and the offender may appeal the grievance immediately. <u>Id</u>., p. 3.

If the inmate is dissatisfied with the response of the warden/superintendent (or designee), he can appeal that decision by submitting a formal Grievance Appeal form to the MNDOC's "central office grievance appeal coordinator" within 15 working days of the date the warden/superintendent (or designee) signed the response. <u>Id</u>. That person will "[d]etermine the appropriate method of investigating the grievance and submit the investigation results with recommendation to the appropriate assistant or deputy commissioner." <u>Id</u>. The assistant or deputy commissioner then makes a final decision on the grievance. <u>Id</u>., p. 4. The assistant or deputy commissioner will respond to the appeal within 20 working days from the date the appeal was logged, and may obtain a one-time 20-working day extension, provided the offender is notified of the extension within the first 20 working days. <u>Id</u>. If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received a notice of extension, the offender may consider the grievance appeal dismissed and the offender may report the matter to the Commissioner for a resolution. <u>Id</u>. Once a grievance has been resolved by the assistant or deputy commissioner or the Commissioner, there are no further appeals. <u>Id</u>. The policy explicitly instructs the offender to "follow the chain of command and contact only one staff at a time." <u>Id</u>., p. 1.

The grievance policy also permits offenders who have been threatened or are in danger to submit their complaint directly to the Central Office Grievance Appeal Coordinator for response by the assistant or deputy commissioner. Id., p. 3. Under these circumstances, all decisions processed by the Central Office are final and there is no second level of appeal. Id.

In summary, the administrative remedies provided by MNDOC are fully exhausted for purposes of § 1997e(a) only when an inmate completes all of the prescribed steps of the MNDOC Grievance Procedure, and receives a final decision from the assistant or deputy commissioner or Commissioner.

MNDOC's grievance policy applies to most conditions of confinement, but has no application to "situations governed by another DOC policy or division directive that has a separate review or appeal procedure." Ebeling Aff. ¶3. "Specific disciplinary decisions are subject to a separate appeal process," (Id., ¶4), but according defendants, "Parks's allegations that staff fabricated disciplinary charges against him," along with "all of Parks other complaints were subject to the MNDOC's grievance process." Id., ¶5.

This Court concludes that Parks' claims against Braun (for filing a false report), Spiess (for coercion), Hagemann (for assault), Strom, Melde and Lilya (for filing false disciplinary reports and presenting false evidence in disciplinary hearings), and O'Hara (for failing to consider evidence submitted via two kites) are all barred because Parks failed to properly exhaust the administrative remedies proscribed by MNDOC for these claims. Unlike the outcomes of the disciplinary hearings which addressed the 2008 and 2009 incidents and are subject to a different appeal mechanism, the conduct of and

resulting claims against Braun, Spiess, Hagemann, Strom, Melde, Lilya, and O'Hara were all subject to MNDOC's grievance process.

For example, to the extent that Parks believed that Braun had filed a false discipline report maliciously or to get even with him for previous interactions, Parks could have timely filed a grievance against her, reciting the facts that he described in the kite he eventually sent on June 28, 2009[16] and the detailed narrative he attached to the grievance he filed on July 14, 2009, nineteen months after Braun filed her report on December 7, 2007. Similarly, Parks could have timely reported Spiess' threats and coercive conduct in 2007 and 2008, Hagemann's unwanted touching (occurring sometime before September 26, 2008, when Ostrander read Parks' class assignment),[17] Strom's presentation of false evidence to Mickelson during the October 2008 hearing, and Melde and Lilya's filing of false reports in 2009. As for the two kites that Parks sent O'Hara on June 28, 2009, and O'Hara's response on July 2, 2009 denying his appeal, even if his grievance of the events described in the kites were timely (which they were not), Parks never appealed O'Hara's decision to MNDOC's Central Office Grievance Appeal Coordinator for consideration and decision by an assistant or deputy commissioner or Commissioner. Ebeling Aff., Ex. 1 (Grievance Procedure, MNDOC Policy No. 303.100). pp. 3-4.

---

[16]      This kite, dated June 28, 2009, states: "Angela Braun claims I refused to let her out of the room, that she was so afraid that she almost went for her radio, that she had to scream at me to return to the barracks. It took her several days to come up with that story. The charges against me were false… ." Pl. Exs., p. 7.

[17]      Neither party provided the Court with a clear timeline of the events described in Parks' Complaint regarding Hagemann. Parks wrote about Hagemann's alleged sexual harassment on or about September 26, 2008. Lahood Aff., Ex. 2. There is no information in the record as to when the incident actually occurred.

Instead, Parks filed one grievance directly to the Central Office regarding his complaints against these individuals for their conduct on July 14, 2009.  Pursuant to MNDOC policy, grievances were due within 30 days of the date of each incident giving rise to the grievance.  All of the incidents covered in Parks' single grievance occurred well outside this timeframe.  Grievances relating to the 2007 and 2008 disciplinary incidents were due within 30 days of the date of the incident giving rise to the grievance; likewise, any grievance relating to the February 15, 2009 disciplinary incident was required to be filed by March 17, 2009.

Further, there is no evidence that Parks lacked access to the grievance process or that MNDOC employees thwarted his efforts to use the process, and he does not allege that he was inhibited from using the process.

Having failed to timely grieve his complaints against Braun, Spiess, Hagemann, Strom, Melde and Lilya, and to timely and completely grieve his complaints against O'Hara, all claims by Parks against these defendants are barred for failure to exhaust administrative remedies pursuant to 42 U.S.C. §1997e(a) and summary judgment on these claims against them should be granted.[18]

---

[18]     In the Complaint, Parks also alleged that he was prevented from filing "incompatibilities" to stop his transfer to facilities housing inmates who had previously threatened him.  Complaint, ¶22 ("Tim Strom came to seg and told me that I would not be shipped out, but I'd better not talk about what happened with the Chaplain anymore. I was released to the general population the next day.").  In his Response, Parks explained that MCF-ML/WR staff used the threat of relocation to coerce him "remain[ing] silent about the alleged incident with Hagemann."  Pl. Resp., p. 23.  Parks attached to his Response the kite he sent to prison officials on April 16, 2009, asking that he not be relocated to Stillwater or Rush City.  Pl. Exs., p.11.  The response to the kite dated April 21, 2009, stated that Parks was being returned to the "ML (Moose Lake) population."  Id.  If Parks believed that he was being coerced by prison staff with threats of relocation to a facility he feared housed inmates who would hurt him, that too was a topic for a grievance.  However, Parks made no mention of the alleged coercion in the

Additionally, this Court recommends that the claims against these defendants be dismissed with prejudice, because the administrative remedies offered by the MNDOC grievance process are no longer available to Parks to exhaust. First, Parks is no longer an inmate of MCF-ML/WR and there is nothing in MNDOC Policy No. 303.100 which indicates that the grievance procedure applies to former inmates. In fact, the policy defines "Offender Grievance" as "a method by which <u>incarcerated</u> offenders may submit a formal concern… ." Ebeling Aff., Ex. 1, p. 1 (emphasis added).

Second, even if Parks could avail himself at this time of the MNDOC grievance policy, any attempt by him to pursue his administrative remedies following dismissal of this suit would be procedurally barred as the various time periods for initiating a claim and appealing a denial have long since passed. Thus, because Parks can no longer exhaust his claims, he has procedurally defaulted on them and his suit is precluded forever and must be dismissed with prejudice. See Woodford, 548 U.S. at 92-93; Johnson v. Meadows, 418 F.3d 1152, 1156 (11th Cir. 2005) (noting the "policies favoring exhaustion," the court held that the PLRA contains a procedural default component where an inmate fails to avail himself in a timely fashion of the institution's administrative process); Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004) ("failure to pursue administrative remedies while they were available precluded [the plaintiff's] federal

---

kite he sent on April 16, 2009. Thus, any complaint about his inability to file incompatibilities due to coercion must be dismissed due to Parks failure to exhaust his administrative remedies regarding that claim.

By the same token, any claim by Parks that he was denied the opportunity by Strom to contact Carlton County officials and an attorney to file assault charges against Hagemann, (Pl. Resp., p. 9; Complaint, ¶¶ 20, 25), was subject to the MNDOC grievance process, but Parks never grieved the matter. As a result, any such claim is also barred due to unexhaustion of administrative remedies.

lawsuits, and they were properly dismissed with prejudice."). For all of these reasons all claims against Braun, Spiess, Hagemann, Strom, Melde and Lilya should be dismissed with prejudice.

### E. Federal Claims

This Court now proceeds to examine Parks' claims that were not subject to the MNDOC grievance process – i.e. the hearings findings and disciplinary measures taken by defendants Mickleson, Dooley and Hendrickson arising out of the 2008 and 2009 incidents violate federal law (First, Eighth and Fourteenth Amendments of the Constitution, or 42 U.S.C. § 1985) and state law.

### 1. Eighth Amendment Claims

In paragraph 27 of his Complaint, Parks' claimed that he was subject to cruel and unusual punishment and brought Eighth Amendment claims against Mickleson, Dooley and Hendrickson for their respective roles in the disciplinary hearings and appeals arising out of the 2008 and 2009 incidents. See Pl. Resp., p. 15 (listing of alleged constitutional violations by defendant, the wrongful action taken and the Amendment violated). This Court agrees with the defendants that Parks has failed to allege or submit facts to trigger the Eighth Amendment's protection against cruel and unusual punishment, and summary judgment on those claims should be granted.

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on those convicted of crimes. See Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981). The prohibition against "cruel and unusual punishments" is violated by the "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney,

509 U.S. 25, 32 (1993) (citation omitted).  To prevail on a cruel and unusual punishment claim under the Eighth Amendment, two requirements must be met.  "First, the deprivation alleged must be, objectively, 'sufficiently serious,'" – meaning that "the prison official's acts or omissions must result in the denial of 'the minimal civilized measure of life's necessities.'"  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quotations and citations omitted).  Second, it must be shown that the prison official, acted with "'deliberate indifference' to inmate health or safety" – meaning that "a prison official must have a 'sufficiently culpable state of mind.'"  Id.  (quotations and citations omitted).

"Solitary confinement is not unconstitutional in and of itself."  Porth v. Farrier, 934 F.2d 154, 157 (8th Cir. 1991) (quotation and citation omitted).  To determine whether solitary confinement or segregation violates the Eighth Amendment, one must examine the totality of the circumstances involved in the confinement, including for example, the length of the confinement, "the size and physical facilities of the cell in which [the plaintiff] was confined, including any provisions for light, heat, and ventilation therein, whether the plaintiff was provided with water, food and eating utensils, along with any necessary medical attention he may have required, and any opportunity he may have had for personal hygiene, sanitation, and exercise, together with the extent of any injury he may have suffered because of those conditions."  Id.  Protracted periods spent in segregation do not necessarily give rise to an Eighth Amendment claim.  See Rahman X v. Morgan, 300 F.3d 970, 974 (8th Cir. 2002) (26 months in segregation and the deprivation of other privileges is not "sufficiently serious" to establish an Eighth Amendment violation"); Wycoff v. Nichols, 94 F.3d 1187, 1188 (8th Cir. 1996) (10 days

of disciplinary detention and 100 days restricted to a maximum security cell does not present "atypical, significant deprivation"); Blue v. Fabian, Civ. No. 10-87 (DSD/AJB) 2010 WL 5571969 *4 (D. Minn. December 8, 2010) (prisoner subject to being held in segregation for years at a time, without alleging specific circumstances and conditions that lead to cruel and unusual punishment is insufficient to support an Eighth Amendment claim); Blue v. Fabian, Civ. No. 10-87 (DSD/AJB) 2011 WL 91039 * 1 (D. Minn. January 11, 2011) (adoption of Report and Recommendation, dated December 8, 2010 by the Honorable District Judge David S. Doty); cf. Overton v. Bazzetta, 539 U.S. 126, 137 (2003) (a claim of "cruel and unusual punishment" under the Eighth Amendment requires a showing of "dramatic departure form accepted standards for conditions of confinement" and the creation of "inhumane prison conditions…").

Here, to the extent that Parks' Eighth Amendment claims are based on the two episodes of segregation he served in 2008 and 2009, as a consequence of discipline imposed on him by Mickelson, Dooley and Hendrickson, Parks was required to present specific facts surrounding his segregation and the state of mind of those who were responsible for placing him in segregation. [19] Parks did not do that.  Apart from

---

[19]     To understand the types of facts a prison would be required to allege to sustain a claim that his confinement in solitary amounted to cruel and unusual punishment, it is helpful to consider the jury instruction the Eighth Circuit upheld in Porth v. Farrier, 934 F.2d 154, 157 (8th Cir. 1991):

Placement in solitary is not unconstitutional in and of itself. However, depending upon the circumstances and the conditions of the confinement, it may, in some cases, constitute cruel and unusual punishment. Prison conditions which only result in discomfort do not amount to cruel and unusual punishment.  In making your determination as to whether or not the plaintiff's confinement in solitary amounted to cruel and unusual punishment, you must consider the totality of the circumstances involved related to his confinement. You must consider the length of his

indicating the length of time he was in segregation (45 days for the 2008 incident and 120 days for the 2009 incident[20]), he provided nothing more than conclusory statements regarding the effects of prison confinement on him.   Having presented no facts to support a claim of cruel and unusual punishment, summary judgment on his Eighth Amendment claims against defendants Mickelson, Dooley and Hendrickson should be granted.

> ## 2. **Fourteenth Amendment Due Process Claims Against Mickelson, Dooley, and Hendrickson**

In support of his Due Process claims, Parks alleged that Mickelson was not impartial during the disciplinary hearings relating to the 2008 and 2009 disciplinary incidents, and that both Mickelson and Dooley, who denied Parks' disciplinary appeal regarding the 2008 disciplinary incident, refused to consider videotaped and audio-recorded evidence that Parks believed would support his version of events.   Pl. Resp., p. 15; Complaint, ¶20; Lahood Aff., Ex. 2, p. 3 (Memorandum from Dooley to Parks dated October 31, 2008 denying Parks' appeal of Mickelson's findings regarding the 2008 disciplinary incident).

---

confinement while without clothing and bedding, the size and physical facilities of the cell in which he was confined, including any provisions for light, heat, and ventilation therein, whether the plaintiff was provided with water, food and eating utensils, along with any necessary medical attention he may have required, and any opportunity he may have had for personal hygiene, sanitation, and exercise, together with the extent of any injury he may have suffered because of those conditions.

[20]   According to the Hearing Findings associated with the 2008 and 2009 incidents, Parks was given 45 days in segregation for the 2008 incident and 120 days in segregation for the 2009 incident.   Lahood Aff., Exs. 2, 3.   Parks claims he spend 76 days in solitary confinement for the 2008 incident, and 67 days in segregation for the 2009 incident, for a total of five months in segregation.   Complaint, ¶20, 21.

As to Hendrickson, Parks alleged that he denied Parks' appeal regarding the 2009 disciplinary hearing.  Parks complained:

> [t]he false charges in [his] discipline record were used against him as evidence [in the 2009 hearing].  When I asked why the discipline officer refused to talk to witnesses or review the recorded evidence that would prove I was telling the truth, staff responded that I was not in charge of the investigation.  I appealed and asked those in charge to review the evidence to no avail.  In all I spent five months in solitary confinement for daring to go to staff with the truth.

Complaint, ¶26.[21]   In short, the thrust of Parks' claims against Mickelson, Dooley, and Hendrickson is that their actions (refusing to consider evidence in disciplinary hearings; failing to conduct impartial disciplinary hearings; refusing to consider evidence on appeal) amounted to a denial of procedural due process under the Fourteenth Amendment, and caused his placement into segregation for five months, (Complaint, ¶¶21, 26), along with two years of extended incarceration, lost wages, and "the loss of eligibility for any other early release program, ineligibility for work release, ineligibility for transfer to a minimum security prison increased custody points."  Id. ¶27.

"To prevail on a Fourteenth Amendment due process claim, [a plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action."  Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010) (quoting Phillips v. Norris, 320 F.3d 844, 846 (8th Cir. 2003)); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2003) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake. A liberty interest may arise from the

---

[21]   Parks' reference to Hendrickson's refusal to consider evidence apparently relates to the audio recording of Strom's interview with Parks regarding the 2008 disciplinary incident and the video that he claims would show that Hagemann placed his hand on Parks' buttocks.

Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by state laws or policies,") (citations omitted). "This analysis as to liberty parallels the accepted due process analysis as to property." Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974).   "The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property.  The requirement for some kind of a hearing applies to the taking of private property, the revocation of licenses, the operation of state dispute-settlement mechanisms, when one person seeks to take property from another, or to government-created jobs held, absent 'cause' for termination.  Id.

Once a deprivation of a protected interest is established, "the next question is what process is due."  See Williams v. Norris, 277 Fed. Appx. 647, 648-49 (8th Cir. 2008) (citing Wilkinson, 545 U.S. at 224).

Parks' Due Process claims against Mickelson, Dooley, and Hendrickson cannot proceed because he cannot establish in the first instance that he was deprived of liberty or property.   To prevail on a Due Process claim with respect to the imposition of segregation as a disciplinary measure, Parks had to make the threshold showing that the conditions he experienced in segregation imposed "atypical or significant hardship…in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484. However, the Eighth Circuit "has consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."  Phillips, 320 F.3d at 847 (emphasis added); see also Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002) ("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin.").   "Thus, in order for [plaintiff] to assert

a liberty interest, he must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." Phillips, 320 F.3d at 847.

Parks neither claimed nor offered any evidence to suggest that the conditions of his five months in segregation were atypical or unduly harsh, much less how they were different from the general population. Rather, the focus of his Due Process claim was that the segregation was imposed following disciplinary hearings and appeals that were not conducted fairly. But how disciplinary proceedings were conducted has no bearing on the determination of whether a liberty interest was affected. Id. ("Phillips is incorrect in asserting that the denial of a hearing should be considered when determining whether a liberty interest was affected. … We do not consider the procedures used to confine the inmate in segregation.") (citations omitted). In sum, the Court only examines the nature and scope of the disciplinary process after the inmate has established that he has been deprived of life, liberty or property. Parks' failure to make out a protected liberty interest in remaining in the general prison population is fatal to his Fourteenth Amendment due process claim regarding his placement in segregation.

As for Parks' assertion that actions by MCF-ML/WR staff "caused [him] two years of extended incarceration," this claim appears to derive from Parks' claims against Braun and Spiess arising out of the 2007 incident involving Braun. See Pl. Resp., p. 13 (stating "I would have been allowed to return home to my family at the conclusion of my six-month program in C.I.P." absent defendants' "unlawful actions in issuing a false discipline report and threatening me with a guaranteed negative verdict and six month solitary confinement should I refuse to sign the document offered me,"). This Court has

already determined that the claims against Braun and Spiess cannot survive defendants' motion for summary judgment due to Parks' failure to exhaust his administrative remedies.   However, even if he had properly exhausted the MNDOC grievance process with respect to these claims against Braun and Spiess, removal from the CIP does not impose "atypical and significant hardship…in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484; see also Moorman v. Thalacker, 83 F.3d 970, 972 (8th Cir. 1996) (interpreting Sandin to mean that prisoner due process rights are implicated only when there have been "deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences.").

Consequently, since Sandin, the Eighth Circuit has consistently held that being excluded from self-improvement programs is just an ordinary incident of prison life, and prisoners are therefore not entitled to the procedural protections of due process when such exclusions occur.   See Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997) (prisoner's "loss of a higher-paying job and other privileges," including loss of ability to earn good time, did not "constitute[ ] an atypical hardship" that would support a due process claim); Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 669-70 (8th Cir. 1996) (revocation of prisoner's work release program "was not an atypical or significant deprivation," so prisoner could not maintain a due process claim based on such revocation); Bailey v. Gardebring, 940 F.2d 1150, 1157 (8th Cir. 1991) ("it is plain that a convicted criminal has no fundamental right to consideration for early release"); Hines v. Fabian, Civ. No. 05-1408 (ADM/AJB) 2005 WL 1936285 * 2 (D. Minn. August 12, 2005) (loss of ability to participate in a prison "boot camp" program

does not constitute a Due Process violation).  See also Staszak v. Romine, No. 99-2519 (8th Cir. 2000), 2000 WL 862836 at * 1 (revocation of half-way house placement and work release program was not "an atypical or significant deprivation" for purposes of resolving prisoner's due process claim); West v. Keane, Civ. No. 93-6680 (JFK) (S.D.N.Y. 1997), 1997 WL 266977 at * 4 ("[i]n the scheme of the inmates' regulated prison life, the cancellation of a specific rehabilitative or vocational program does not cause the sort of 'major disruption' of plaintiffs' environment that rises to the level of a due process violation").

For the same reasons, Parks' claim that he lost eligibility for any other early release program, was ineligible for work release, was ineligible for transfer to a minimum security prison, and received  increased custody points do not give rise to a protectable liberty interest such that due process is required. See Portley-El, 288 F.3d at 1065 (reclassification to maximum security classification not subject to a due process claim); Frietas v. Ault, 109 F.3d 1335, 1337 (8th Cir. 1997) (loss of favorable parole opportunity did not violate prisoner's Due Process rights); Callender, 88 F.3d at 668-69 (8th Cir. 1996); Moorman, 83 F.3d at 972 (due process not required before transferring a prisoner from minimum to maximum security facility).  Defendants should be granted summary judgment on these claims.

As to Parks' claim for lost wages, the basis of this claim is unclear.  To the extent that Parks is contending that he lost income as a result of losing his place in the CIP and having to remain in prison, rather than being out on supervised release, the Court has addressed that claim above, noting that Parks had no constitutionally protected interest in remaining in the CIP.

To the extent that Parks' claim is for <u>prison</u> wages lost, Parks has no property interest in prison wages.  For an interest to be "property" within the meaning of the Due Process clause, it must be "an individual entitlement grounded in state law, which cannot be removed except "for cause."  <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422,430 (1982) (citations omitted) "Property interests…are not created by the Constitution…they are created and…defined by existing rules or understandings that stem from an independent source such as state law."  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972).  Therefore, Parks only has a property interest in his prison wages if Minnesota law creates that interest, and the courts have concluded that he does not. <u>See</u> <u>Freitas v. Ault</u>, 109 F.3d 1335, 1338 (8th Cir. 1997) (loss of higher paying prison job is not a constitutional violation); <u>Hrbek v. Farrier</u>, 787 F.2d 414, 416 (8th Cir. 1986) (prisoner has no property interest in prison wages, which are paid at the discretion of prison officials, pursuant to Iowa statute); <u>Bounds v. O'Dell</u>, 61 F.3d 908, 908 (Table Opinion) (8th Cir. 1995) (<u>per</u> <u>curiam</u>) (affirming district court's grant of summary judgment to prison officials on prisoner's suit regarding denial of wage increases— prisoner presented no evidence that his interest in the wage increases amounted to a legitimate claim of entitlement grounded in state law); <u>McMaster v. State of Minn.</u>, 819 F. Supp. 1429, 1442 (D. Minn. 1993) (noting that a prisoner's claim to a state-created protected property interest in any particular wage fails, because payment of wages by prison officials is discretionary under Minnesota law).[22]

---

[22]    Minn. Stat. §243.22 states in pertinent part: "Notwithstanding any law to the contrary, the commissioner of corrections <u>may</u> provide for the payment to inmates of correctional facilities under the commissioner's management and control any pecuniary compensation the commissioner deems proper…" (emphasis added).

Where Parks cannot make a property interest in lost wages, any procedural due process claim related to a claim for lost wages must be dismissed

### 3.  Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment forbids a state to "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §1. "The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates."  Murphy v. Missouri Dept. of Corrs., 372 F.3d 979, 984 (8th Cir. 2004) (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)).  In order to succeed on an equal protection claim, a claimant must prove that he has been treated differently from other similarly situated individuals, either by operation of a state law or regulation, or by a decision by a state official.  See Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("[i]n general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert denied, 534 U.S. 816 (2001) (citing Klinger v. Dep't. of Corrs., 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995)).

It is not enough, however, for an equal protection claimant to show that he has been treated differently from others who are similarly situated; he must also show that there is no rational basis for the dissimilar treatment he received.  Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 921 (8th Cir. 2001) ("[a] plaintiff may bring an equal protection claim... where she alleges 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment'") (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); see also Phillips, 320 F.3d at 848 ("Because Phillips does not allege he was a member of a protected class or that a fundamental right was violated, he must show

that 'similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest.'") (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir.1998)); Hosna v. Groose, 80 F.3d 298, 304 (8th Cir. 1996) ("[t]o prevail in their claims, the Inmates must prove that '(1) persons who are similarly situated are treated differently by the government, and (2) [that] the government [has failed] to provide a rational basis for the dissimilar treatment'"), cert. denied, 519 U.S. 860 (1996), quoting Moreland v. United States, 968 F.2d 655, 660 (8th Cir.) (en banc), cert. denied, 506 U.S. 1028 (1992).

Finally, the claimant must show intentional or purposeful discrimination. Klinger v. Dep't of Corr., 31 F.3d 727, 733 (8th Cir.1994)"). Thus, to prevail on an Equal Protection claim, a plaintiff must show that the challenged action "had a discriminatory effect and was motivated by a discriminatory purpose." United States v. Armstrong, 517 U.S. 456, 465 (1996).

Here, Parks has not pled that he is a member of a protected class or that a fundamental right is implicated. Nor has he met "the first step in an equal protection case [which] is determining whether the plaintiff has demonstrated that [he] was treated differently than others who were similarly situated." Klinger, 31 F.3d 727, 731 (8th Cir. 1994). "Absent a threshold showing that [he] is similarly situated to those who allegedly receive favorable treatment, [Parks] does not have a viable equal protection claim." Id. (citation omitted). Finally, Parks has not presented any evidence of intentional or purposeful discrimination.

There are no facts to support an Equal Protection claim. On that basis, defendants' motion for summary judgment on Parks' Equal Protection claim should be granted.

### 4.    First Amendment Retaliatory Discipline Claim

Parks has alleged that he suffered retaliatory discipline for the exercise of his First Amendment right to free speech. Complaint, ¶27; Pl. Resp., pp. 15-19.[23]  The essence of his claim is that all three of the disciplinary incidents flowed from his exercise of free speech. Regarding the 2007 disciplinary incident, Parks alleged that he was merely expressing his concern about a possibly impaired staff member, and was wrongfully punished for doing so. Complaint, ¶19**.**  Regarding the 2008 disciplinary incident, Parks alleged that he was unlawfully punished for writing a homework assignment about Hagemann's alleged physical and sexual assault against him. Complaint, ¶20.  As to the 2009 disciplinary incident, Parks alleged that he was illegally punished for speaking about the Hagemann incident in response to a question by a staff member. Complaint, ¶21.

Defendants argued that Parks' First Amendment retaliatory discipline claims should be dismissed because Parks failed to allege any facts to establish that the discipline was "imposed by biased prison officials in retaliation for exercising his constitutional rights." Def. Mem., p. 8, Defendants' Reply Memorandum in Support of Motion to Dismiss or For Summary Judgment ("Def. Reply"), pp. 7-8 [Docket No. 19].

---

[23]      Parks did not list a First Amendment violation with respect to Mickelson, Dooley and Hendrickson in the chart included in his Response. Pl. Resp., p. 15.  However, based defendants' analysis and on Parks' arguments, this Court concludes that Parks had asserted a First Amendment retaliatory discipline claim in connection with the 2008 and 2000 incidents.

Additionally, the MNDOC defendants argued that the discipline imposed on Parks met the "some evidence" standard described in Bandy-Bey v. Crist, 578 F.3d 763, 766 (8th Cir. 2009) ("[A] defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation.") (citations omitted)). Def. Mem., p. 9.

"An inmate may maintain a cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for an inmate's exercise of constitutional rights." Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008) (citing Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir.1989)). Additionally , a "prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegation." Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990). "'A prima facie case of retaliatory discipline requires a showing that: (1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline.'" Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009) (quoting Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007)). Thus, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendants' retaliatory motive. Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); see also Webb v. Hedrick, 2010 WL 4366438 * 1(8th Cir. 2010) ("Even at summary judgment, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred.'") (quoting Sisneros v. Nix, 95 F.3d 749, 752 (8th

Cir.1996) (quoting Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993)).  It is also reasonable to assume that prison officials, like other officials, are presumed to be impartial decision makers, and an inmate's subjective beliefs, without more, that the officials acted improperly, are insufficient to survive summary judgment.  Cf. de Llano v. Berglund, 282 F.3d 1031, 1035-36 (8th Cir.2002) ("'We begin with a presumption that decision-makers are honest and impartial.  [The plaintiff] offers no evidence of vindictive behavior beyond his mere statement of belief that the Board members acted in this manner…[The plaintiff's] beliefs have no effect and do not create a genuine issue of material fact that would preclude summary judgment.'") (quoting Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir.1996) (bracketing in de Llano).

        An inmate's claim of retaliatory discipline fails "if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule."  Hartsfield, 511 F.3d at 829.  "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation."  Id.  (citing Goff, 7 F.3d at 738-39).  "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker."  Bandy-Bey, 578 F.3d at 766 (emphasis added) (citing Hartsfield, 511 F.3d at 831).  Relying on Hrbek v. Nix, 12 F.3d 777, 781 (8th Cir. 1993), the Eighth Circuit in Hartsfield explained that requirement of impartiality is satisfied by a hearing that "ensures that the inmate has an opportunity to persuade an impartial decisionmaker, who must give written justification for his decision, that discipline is not

warranted." Hartsfield, 511 F.3d at 831 (quoting Hrbek, 12 F.3d at 781) (discussing hearing requirements set forth in by Wolff v. McDonnell, 418 U.S. 539 (1974)).

In Wolff, "the Supreme Court has outlined procedures correctional facilities must follow to conduct an impartial due process hearing on a disciplinary matter." Hartsfield, 511 F.3d at 830 (citing Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974)).  An inmate is entitled to: (1) advance written notice of the claimed violation at least 24 hours before the disciplinary hearing; (2) the right to call witnesses and present documentary evidence in his defense, if doing so will not jeopardize institutional safety or correctional goals; and (3) to receive a written statement from an impartial decisionmaker identifying the evidence relied upon and the reasons for the disciplinary action.  See Wolff, 418 U.S. at 563-66.

On the other hand, "[i]n the prison context, where swift and sure punishment is often imperative, the Constitution does not require trial-like evidentiary standards." Hrbek, 12 F.3d 777. In Wolff, the Supreme Court recognized that the prison environment necessitated granting prison officials discretion in setting evidentiary standards in disciplinary hearings:

> Ordinarily the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution…prison official must have the discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

Wolff, 418 U.S. at 566.  Consequently, neither confrontation nor cross-examination of witnesses are required to pass Constitutional muster.  Id. at 567.

If a court concludes that the "some evidence" standard is satisfied, it need not reach the issue of whether there is sufficient evidence connecting the plaintiff's discipline with his exercise of First Amendment rights.  Hartsfield, 511 F.3d at 829.

With these principles in mind, the Court now examines each of Parks' First Amendment retaliatory discipline claims.

a.    2007 Discipline

This Court has already determined that the claims arising out of the 2007 incident are barred as a result of Parks' failure to exhaust his claims against Braun for making a false report and Spiess for threatening and coercing Parks into pleading guilty to the charges of failing to comply with an order, abuse/harassment, and disorderly conduct. Lahood Aff., Ex. 1, p. 1.  However, even if the claims were not barred, Parks cannot make out a First Amendment retaliatory discipline claim against either defendant.  Parks signed a plea of guilty, waiving his right to a hearing on the charges.  Id., p. 2.  The discipline meted out, segregation, was clearly based on "some evidence" – in this case, Parks' admission of guilt.  Moreover, while Parks alleged that Braun made a false report and that Spiess coerced his plea, apart from these bare assertions, there is no evidence in the record to support those allegations or to establish that any of the remaining defendants—Mickelson, Dooley or Hendrickson—were responsible for the discipline ultimately ordered.   Stated otherwise, Parks presented no evidence to suggest the person responsible for the order of segregation was motivated by Parks' exercise of his First Amendment rights with Braun.  See Wickner v. McComb, Civil No. 09-1220 (DWF/JJK), 2010 WL 3385079 at *14 (D. Minn. July 27, 2010) ("[O]ther than his bare assertion, Plaintiff has made no showing that Defendants…were motivated by a desire

to retaliate against him for filing a grievance."); 2010 WL 3385082 at *1 (D. Minn. August 23, 2010) (Order Adopting Report and Recommendation).

b.    2008 Discipline

In the second instance, Parks was disciplined for abuse and harassment following a disciplinary hearing before Mickelson.  Lahood Aff., Ex. 2, p. 2.  The record indicates that Mickelson heard testimony from Michelle Ostrander, the staff member who reported the incident after reading the homework assignment in which Parks accused Hagemann of sexual harassment, and considered the incident report.  See Lahood Aff., Ex. 2, p. 1.  Mickelson's findings also state that he contacted "OSI" (Strom) who reported his version of what Parks' told him during the investigation after Parks testified that Hagemann "sexually abused" him.  Id.

Accepting Parks' version of events as true, this Court must determine whether in light of the requirements of Wolff, Mickelson's findings met the "some evidence" standard where the facts are that Mickelson accepted evidence from Strom outside the hearing, and refused to consider the video and audiotape evidence that Parks' claimed would prove that he was telling the truth about Hagemann.  This Court concludes that because the disciplinary hearing did not comport with the dictates, spirit or intent of Wolff, Mickelson's findings are not supported by "some evidence."

Disciplinary actions may be based solely on a guard's report or oral testimony. See Hrbek, 12 F.3d at 781 ("[D]isciplinary actions may be taken-and often they are-based only on a guard's report.  Even when there is substantial evidence to the contrary, the committee may find the guard's report to be credible and therefore take disciplinary action.") (citing Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 456

54

(1985)) (constitutionally sufficient evidence consisted of guard's report and oral testimony)).  Here, however, neither Ostrander's report nor her testimony supported the conclusion reached by Mickelson that Hagemann did not sexually harass or assault Parks.  All that Ostrander indicated was that Parks had written in his homework assignment that he had been sexually harassed by Hagemann.  See Lahood Aff., Ex. 2, pp. 1-2.  Thus, Ostrander's report and testimony did not provide "some evidence" that Parks was not sexually harassed by Hagemann.

The only evidence in the record that supported Mickelson's findings that Hagemann did not sexually harass Parks was the conversation Mickelson had with defendant Strom outside of Parks' presence, in which Strom told Mickelson that Parks had stated in his interview that he had not been sexually harassed by Hagemann.  Lahood Aff., Ex. 2, p. 2.  According to Strom, Parks indicated that when Hagemann brushed up against Parks and did not say "excuse me," Parks felt "disrespected.  Id.

As stated above, under some circumstances, a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, can legally suffice as "some evidence" upon which to base a prison disciplinary violation.  See Bandy-Bey, 578 F.3d at 766.  Carrying that logic forward, if a report is sufficient to meet the "some evidence" rule, presumably a conversation between the hearing officer and another correctional officer outside of the hearing is also sufficient.  However, this holding is not without limits.  The Eighth Circuit expressly premised its conclusion in Bandy-Bey on the requirement that "the violation [which relied solely on a report by a correctional officer] is found by an impartial decisionmaker," (578 F.3d at 766 (citing Hartsfield, 511 F.3d at 831)) – meaning that the disciplinary hearing met the requirements of Wolff.

There is no dispute that Parks received the required advance written notice of the claimed violation before the disciplinary hearing, and that he received a written statement from Mickelson identifying the evidence relied upon and the reasons for the resulting disciplinary action.  See Lahood Aff., Ex. 2, pp. 1-2.  However, in Wolff, the Supreme Court made clear that in addition to providing the inmate with advance notice of charges and a written statement explaining the basis for the decision, the correctional facility must allow the inmate to call witnesses and present documentary evidence in his defense, if doing so is not "unduly hazardous to institutional safety or correctional goals."  Wolff, 419 U.S. at 566.  Here, Parks was not permitted to present the documentary evidence he asserted supported his claims that Hagemann sexually harassed him (the video of the encounter) and that he had told Strom he had been sexually harassed (the audiotape of Strom's interview of Parks).  Further, Mickelson never explained in his findings why he refused to allow Parks to present this evidence, and Dooley not only did not address this issue in her Appeal decision, but she too refused to examine this evidence, without explanation.[24]  See Lahood Aff., Ex. 2, pp. 2-3.  Consequently, this Court has no facts or basis from which it can conclude that the

---

[24]    The Supreme Court in Wolff did not require prison official to explain why they had refused to allow an inmate to call witnesses or present evidence.  See Wolff, 418 U.S. at 566; see also Ponte v. Real, 471 U.S. 491, 496 (1985) (holding that due process does not require that the reasons for refusing to call witnesses requested by an inmate at a disciplinary hearing be placed in writing.).  At the same time, the Wolff Court acknowledged it would be useful for the disciplining body to "state its reasons for refusing to call a witness, whether it be irrelevance, lack of necessity, or the hazards presented in individual cases."  Id.  Similarly, the Ponte Court recognized "[w]hile some might see an advantage in building up a sort of 'common law of the prison' on this subject, others might prefer to deal with later court challenges on a case-by-case basis. We hold that the Constitution permits either approach."  Ponte, 471 U.S. at 498.

documentary evidence Parks sought to introduce was properly rejected because it "is unduly hazardous to institutional safety or correctional goals."[25] Wolff, 418 U.S. at 566.

For all of these reasons, this Court finds that there is a genuine dispute of material fact as to whether the disciplinary hearing conducted by Mickelson and his decision, along with Dooley's affirmance, met the dictates of Wolff. Defendants' motion for summary judgment on Parks' First Amendment retaliation claim regarding the 2008 incident should be denied.

c.   2009 Hearing

Parks alleged that the discipline imposed following the 2009 hearing amounted to retaliation under the First Amendment because he was improperly punished for speaking about the Hagemann incident in response to a question by Melde. According to Parks, Melde and Lilya falsely accused him of talking about the Hagemann incident unprompted, for which he was found guilty of charges and placed in segregation following a hearing before Mickelson who again refused to review the video of Parks' encounter with Hagemann or the audiotape of Strom's interview of Parks. Complaint, ¶21; Pl. Resp., p. 10. In short, Parks' claim rested primarily on his complaint that Mickelson and Hendrickson refused to consider evidence that Parks believed would absolve him of the disciplinary charges. Pl. Resp., pp. 19-21.

Defendants' motion for summary judgment on the 2009 incident should be denied. First, no evidence was presented to this Court from which it could conclude that any evidence, much less "some evidence," supported Mickelson's findings. To

---

[25]   Unlike the examples discussed in Wolff, 418 U.S. at 566, where calling staff or inmates to testify at a disciplinary hearing could be deemed to impinge on institutional safety or correctional goals, this Court has substantial doubt that these objectives would have be implicated by the production and review of a prison video and audiotape.

establish impartiality, <u>Wolff</u> and the Eighth Circuit explicitly require the inmate to receive a written statement from an impartial decisionmaker identifying the evidence relied upon and the reasons for the disciplinary action.  <u>See Wolff</u>, 418 U.S. at 564; <u>Hartsfield</u>, 511 F.3d at 830; <u>Hrbek</u>, 12 F.3d at 780-81; <u>Freitas v. Auger</u>, 837 F.2d 806, 809 (8th Cir. 1988.) ("The Constitution requires that a written statement be drafted contemporaneously with the disciplinary action which informs an inmate of the evidence and reasons relied upon by the factfinders in reaching their decision.") (citing <u>Brown v. Frey</u>, 807 F.2d 1407, 1411-12 (8th Cir.1986)).

> The written statement requirement serves two interrelated purposes. First, the requirement prevents arbitrary action by disciplinary boards; it "helps to insure that administrators * * * will act fairly." Second, the written statement requirement facilitates review of the disciplinary proceeding by those reviewing bodies having penological concerns-such as officials considering whether to transfer an inmate to another institution and parole boards making parole decisions-as well as those reviewing bodies more interested in the fairness and constitutional propriety of the proceeding-for example, state officials, the public, and the courts.

<u>Brown</u>, 807 F.2d at 1411 (quoting and citing <u>Wolff</u>, 418 U.S. at 565).

The written statement requirement is "satisfied if the written statement, even though 'sparse in content,' is 'sufficient to inform [the inmate] of the evidence relied upon by the factfinders in reaching their decision to take disciplinary action.'" <u>Id.</u> at 1412 (quoting <u>Jensen v. Satran</u>, 688 F.2d 76, 78 (8th Cir.1982), <u>cert.</u> <u>denied</u>, 460 U.S. 1007(1983)).

> This [requirement] ensures that disciplinary boards will not act arbitrarily, and it forces a disciplinary board to commit itself, contemporaneously with its decision, to certain evidence, thus allowing a reviewing body to fairly and accurately review the incident that led to the proceeding or the proceeding itself. After this, due process requires no more, and it certainly does not dictate that we expose a disciplinary board's written statement to such extensive scrutiny that we fail to adequately respect "the legitimate institutional needs of assuring the safety of inmates and prisoners,

avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation."

Id., quoting Superintendent v. Hill, 472 U.S. 445, (1985).

Unlike the Hearing Findings issued following the 2008 incident, Mickelson's 2009 decision was not merely "sparse"—it was completely devoid of any explanation regarding the evidence upon which he relied for his decision or the reasons for his decision. See Lahood Aff., Ex. 3, p. 2 (section entitled "Hearing Narrative" is blank). The decision only states that Lilya and Melde appeared as witnesses and that the evidence received was "Incident Reports,[26] Prior Disciplinary History – Formal/Informal." Id.

In the same vein, Hendrickson's denial of Parks' appeal of Mickelson's decision did not cure this defect. Although the denial referenced an "audio," "evidence from the hearing" and "testimony," this Court is completely in the dark as to the information Hendrickson reviewed to conclude that "the evidence supported the charges." Id., p. 3.

In the face of a record that completely neglects to identify the evidence relied upon and the reasons for the disciplinary action taken against Parks, the Court has no basis from which it can perform its independent review to determine if the disciplinary decision was supported by "some evidence." See Moore v. Plaster, 266 F.3d 928, 931 (8th Cir. 2001) (reversing District Court's holding that there was "sufficient evidence to support the disciplinary committee's determination that [plaintiff] had violated prison rules," where "the record fails to contain 'some evidence' that the disciplinary actions

---

[26]    The Court is not even able to discern from the record which "Incident Reports" Mickelson was referencing in his decision. Indeed, the record before the Court only contains the one Notice of Violation, which also states that "Incident Reports" may be introduced. Lahood Aff., Ex. 3, p. 1.

taken against [plaintiff] were for the actual violation of prison rules."). On this basis alone, summary judgment cannot be granted.

Second, as this Court found with regard to the infirmities of the 2008 hearing and appeal, it has no facts or basis to conclude that the documentary evidence Parks sought to introduce in connection with the 2009 disciplinary proceeding – the video of his encounter with Hagemann and the audiotape of his interview with Strom – was properly rejected by Mickelson and Hendrickson because it "is unduly hazardous to institutional safety or correctional goals." Wolff, 418 U.S. at 566.

For all of these reasons, this Court finds that there is a genuine dispute of material fact as to whether the disciplinary hearing conducted by Mickelson, his decision and Hendrickson's affirmance of the decision, met the dictates of Wolff. Defendants' motion for summary judgment with respect to Parks' First Amendment retaliation claim arising out of the 2009 incident should be denied.

### 5. **Conspiracy**

Parks did not plead a claim of conspiracy in his Complaint, nor list it in his chart of violations in his Response. See Complaint, ¶27; Pl. Resp., p. 15. Nevertheless, in light of his allegations that defendants "encouraged each other to perpetuate [a] lie that Plaintiff recanted in a recorded interview" and that they engaged in an "intentional cover-up," (Complaint, ¶¶ 25, 27), this Court (as did defendants) will construe his Complaint to include a claim of conspiracy.

Defendants argued that any purported claim of a §1985 conspiracy[27] should be dismissed because Parks cannot make out the required agreement among defendants to support an actionable claim, and in any event, an agreement among employees of a governmental entity is not viable because a governmental entity cannot conspire with itself.  Def. Mem., p. 14-15; Def. Reply, p. 10.  In opposition, Parks claimed that he was the victim of an agreement to commit a conspiracy as evidenced by "every person took part in filing a false discipline reports, used coercion to obtain a signature, ignored evidence in their possession or refused to correct mistakes committed by their fellow

---

[27]  Defendants briefed this issue assuming that Parks was proceeding under 42 U.S.C. §1985.  Def. Mem., p. 14-15.  Parks' Complaint, however, indicates that he is proceeding under 42 U.S.C. §1983.  Complaint, ¶1.  To establish a claim under §1985 Parks must allege and demonstrate: (1) a conspiracy; (2) for the purpose of depriving another of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or deprivation of a legal right.  See Federer v. Gephardt, 363 F.3d 754, 757-58 (8th Cir. 2004 (citation omitted); see also Larson by Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996 (en banc); D.W. v. Radisson Plaza Hotel Rochester, 958 F. Supp. 1368, 1376 (D. Minn. 1997).  An agreement between the conspirators is an essential element of a claim under §1985. See Jensen v. Henderson, 315 F.3d 854, 862 (8th Cir. 2002) ("To prove an a constitutional conspiracy [under §1985] [plaintiff] must prove an agreement between the conspirators").  Claims under §1985(3) also require a plaintiff to demonstrate a racial or class-based animus.  See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); see also City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989) ("The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based 'invidiously discriminatory animus.") (citation omitted); Bartell v. Lohiser, 215 F.3d 550, 560 (6th Cir. 2000) (finding that §1985(3) covers only "conspiracies against: 1) classes who receive the heightened protection under the Equal Protection Clause; and 2)those 'individuals who join together as a class for the purpose of asserting certain fundamental rights'") (quotation omitted).

In reviewing Parks' submissions, it is clear to this Court that he is alleging a conspiracy to deprive him of his constitutional rights under §1983.  For the reasons stated below, it makes no difference whether Parks believed he was proceeding under §1983 or §1985, because he has failed to allege facts sufficient to support a claim under either statute.

employees". Pl. Resp., p. 22. Parks did not, however, provide this Court with any evidence to make out such an agreement.

"To prove a § 1983 conspiracy claim, [plaintiff] must show 'that the defendant conspired with others to deprive…[him] of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff.'" Lawrence v. City of St. Paul, Civil No. 09-2198 (PJS/JJK), 2010 WL 3724380 at *20 (D. Minn. 2010) (quoting Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999)).[28] Furthermore, "a conspiracy claim under § 1983 'requires allegations of specific facts tending to show a meeting of the minds among the alleged conspirators.' Id.; see also Murray v. Lene, 595 F.3d 868, 870 (8th Cir. 2010) (a conspiracy under §1983 "requires allegations of specific facts tending to show a 'meeting of the minds' among the alleged conspirators") (quoting Kearse v. Moffett, 311 F.3d 891, 892 (8th Cir. 2002)); Dossett v. First State Bank, 399 F.3d 940, 951 n.2 (8th Cir. 2005 (citing cases regarding the requirement that a §1983 conspiracy requires evidence of an agreement or "meeting of the minds.");Duvall v. Sharp, 905 F.2d 1188, 1189 (8th Cir. 1990) (to plead conspiracy in a § 1983 action, a complaint must allege specific facts suggesting mutual understanding among the conspirators "to take actions directed toward an unconstitutional end"). "[T]hat two people had the opportunity to conspire—i.e. that they could have met with each other, or called each other or emailed each other—is obviously not sufficient to "nudge[ ]" a conspiracy claim "across the line from conceivable to plausible." Lawrence, 2010 WL 3724380 at *21 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Parks has alleged no facts, other

---

[28]    A claim of conspiracy under §1985 similarly requires proof of an agreement. See n.27, supra.

than his conclusory statement that such a conspiracy existed, to support his claim.  As a result, his conspiracy claim fails.

Furthermore, the individual MNDOC defendants and MNDOC are treated as a single entity under the law, "and a government entity cannot conspire with itself." Barstad v. Murray County, 420 F.3d 880, 887 (8th Cir. 2005).

For all of these reasons, this Court recommends defendants be granted summary judgment on this claim.

### F.   State Law Claims

This Court has concluded that Parks has two viable claims remaining in this suit over which the Court has original jurisdiction.  Consequently, the Court will exercise its supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) and consider Parks' state law claims against the remaining three defendants, Mickelson, Dooley and Hendrickson. However, for the reasons stated below, this Court finds that the state claims against these defendants must be dismissed on summary judgment.

### 1.   Defamation

To support a claim of defamation under Minnesota law, a plaintiff must show that: (1) the defamatory statement is "communicated to someone other than plaintiff," (2) the statement is false, and (3) the statement "tends to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community.  Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919-20 (Minn. 2009) (quoting Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980)).  Parks alleged that the "false statements made concerning the interview conducted by Tim Strom were communicated to persons other than [himself]…the statements were defamatory and…harmed [his] reputation as they

caused others to believe that I made false statements about staff and under no circumstances was I to be believed." Pl. Resp., p. 24.

A defamation claim requires a showing of actual harm to reputation.[29] Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 28 (Minn. 1996). The type of evidence that could sustain the "harm to reputation" element of a defamation claim includes lost income; others indicating that they think less of the plaintiff; change in behavior of persons interacting with the plaintiff; or hearing rumors in the community regarding the defamatory statement. Id. Summary judgment may be granted if a plaintiff can point to "no specific facts demonstrating that [his] reputation has been affected." Id.

Assuming that Parks could establish that Mickelson, Dooley and Hendrickson made false statements to a third party about him, the Court finds that Parks has failed to make out a case of defamation against these defendants because he has alleged no facts regarding the third element of defamation—harm to reputation and a lowering of his estimation in the community.[30] Lacking facts to support this third element, warrants dismissal of this claim on summary judgment.

---

[29] In certain actions, damage to reputation will be presumed. Richie, 544 N.W.2d at 26. "Among those types of actions which are defamatory per se are false accusations of committing a crime….or if the statement imputes serious sexual misconduct to the subject of the statement." Id. (citations omitted).

[30] The Court also observes that to the extent that Parks' defamation claim relates to statements or written findings made by Mickelson, Dooley, or Hendrickson, in the context of the 2008 and 2009 disciplinary hearings, the defendants are likely protected by absolute privilege. Mahoney & Hagberg v. Newgard, 729 N.W.2d 302, 306 (Minn. 2007) ("Statements, even if defamatory, may be protected by absolute privilege in a defamation lawsuit if the statement is (1) made by a judge, judicial officer, attorney or witness; (2) made at a judicial or quasi-judicial proceeding; and (3) the statement is relevant to the subject matter of the litigation…when absolute privilege applies, the speaker is completely shielded from liability for her statements, even statements that are intentionally false or made with malice.") (citations omitted)

2.     **Malicious Prosecution**

Parks has alleged that defendants conduct amounted to "malicious prosecution." Complaint, ¶27.  He did not specify whether he was claiming malicious prosecution for the wrongful pursuit of a civil suit or a criminal prosecution.  Minnesota recognizes a cause of action for malicious prosecution in both the civil and criminal context.  See Wild v. Rarig, 234 N.W. 2d 775, 792 (Minn. 1975) (distinguishing the actions of malicious prosecution for civil and criminal actions).  To state a claim for malicious prosecution, based on the wrongful pursuit of civil suit, Parks must demonstrate that: (1) the action was brought without probable cause or reasonable belief that the plaintiff would ultimately prevail on the merits; (2) the action must be instituted and prosecuted with malicious intent; and (3) the action terminated in his favor.  Jordan v. Lamb, 392 N.W.2d 607, 609 (Minn. Ct. App. 1986), review denied (Aug. 26, 1986) (citing First Nat'l Bank v. Marquette Nat'l Bank, 482 F. Supp. 514, 522-23 (D.Minn. 1979)).  Similarly, to prevail on a claim for malicious prosecution of a criminal proceeding, Parks must show: "(1) that defendants initiated criminal proceedings against [him] (a) without probable cause and (b) with malice, and (2) that the proceedings terminated in [his] favor."  Lawrence, 2010 WL 3724380 at *22 (citing Henry v. City of Minneapolis, 512 F.Supp. 293, 295 (D.Minn.1981); Stead-Bowers v. Langley, 636 N.W.2d 334, 338 (Minn.Ct.App.2001)).  A criminal "prosecution is a formal and public declaration, with the apparent sanction of the officers of the law, that the person against whom the charge is made is a criminal, and guilty of the particular crime charged."  Bryant v. American Sur. Co. of NY, 69 Minn. 30, 71 N.W. 826 (Minn. 1897).

A party is entitled to summary judgment as a matter of law "when the record reflects a complete lack of proof on an essential element of the opposing party's claim." Dunham v. Roer, 708 N.W.2d 522, 569 (Minn. Ct. App. 2006). "An essential element of a malicious prosecution claim is the ultimate termination of a prior suit in favor of the defendant." Stead-Bowers, 636 N.W.2d at 338.

As an initial matter, no criminal or civil proceedings were initiated against Parks by defendants. Therefore, the first two elements of malicious prosecution were not met. Most importantly, even if the 2008 and 2009 disciplinary proceedings could be construed as a "civil action" or "criminal proceeding," neither hearing terminated in Parks' favor. See Lamb, 392 N.W.2d at 609 ("Because a suit for malicious prosecution cannot be maintained until the termination of the prior litigation, it is obvious that [plaintiff's] malicious prosecution claim could not have been litigated at anytime during the prior action."). Indeed, the issue of whether the outcomes of those hearings were lawful or unlawful (i.e. should have terminated in Parks' favor) is exactly the issue that is being litigated in the instant suit. Therefore, the third and "essential" element of malicious prosecution fails and summary judgment on Parks' malicious prosecution claim must be granted.

### 3.  False Imprisonment

"In the context of a claim for false arrest or false imprisonment, 'the essential elements of plaintiff's claim for relief are (1) an arrest performed by defendant, and (2) the unlawfulness of such arrest. Lundeen v. Renteria, 302 Minn. 142, 146, 224 N.W.2d 132, 135 (1974). If an arrest is made without proper legal authority, it is a false arrest. Subsequent restraint is false imprisonment. Id. False imprisonment is 'any imprisonment

which is not legally justifiable'.  Kleidon v. Glascock, 215 Minn. 417, 425, 10 N.W.2d 394, 397 (1943)." Perkins v. St. Louis Co, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986).

It is axiomatic that the cornerstone of false imprisonment is a false arrest by persons who have the power to initiate a criminal proceeding pursuant to state or federal statute or local ordinance.  While Parks stated that he was "arrested" by prison officials upon being charged with violations of prison rules, he was not "arrested" by local, state or federal law enforcement for violations under local, state or federal law. Further, although he was subsequently placed in segregation, segregation does not amount to false imprisonment, particularly where Parks was already lawfully confined in prison.  Parks' claim for false imprisonment must be dismissed.

## 4.  Misrepresentation

Under Minnesota law, claims for misrepresentation may be categorized as intentional or negligent.  Florenzano v. Olson, 387 N.W.2d 168, 173 (Minn. 1986) ("an actionable misrepresentation requires proof either that the misrepresenter acted dishonestly or in bad faith, i.e. with fraudulent intent, or, alternatively, the misrepresenter was negligent.").  Because Parks did not distinguish between these two forms of misrepresentation in his Complaint, this Court analyzed his pleadings under both types of misrepresentation.[31]

---

[31]     Although defendants did not make this argument, the Court observes that this lack of specificity is fatal under the standards required by Fed. R. Civ. P. 12(b)(6) and Twombly.  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).  In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint."  Ossman v. Diana Corp., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal

Fraudulent or intentional misrepresentation requires a showing that there was: (1) a representation; (2) that the representation was false; (3) that it had to do with a past or present fact; (4) that the fact was material; (5) that the fact was susceptible of knowledge; (6) the representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it was true or false; (7) the representer must intend to have the other person induced to act, or justified in acting upon it; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that the person suffered damage; and (11) that damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.  Davis v. Re-Trac Mfg. Corp, 149 N.W. 2d 37, 38-39 (Minn. 1967).  See also Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986); Florenzano v. Olson, 387 N.W.2d at 173-74.

The tort of negligent misrepresentation is defined as:

> One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

---

quotation marks and citations omitted).  At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must meet the principles articulated by the United States Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).  Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S., at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556).

Valspar Refinish, Inc. v. Gaylord's Inc., 764 N.W.2d 2009).[32]   Proof of the subjective

state of the misrepresenter's mind…is not needed to prove negligence."   Florenzano,

387 N.W.2d at 174.

Based on the definition for negligent misrepresentation, it is clear that Parks has

not alleged such a claim.  Therefore, this Court considers whether he has raised any

genuine issues of material fact regarding the essential elements of intentional

misrepresentation.

Here, Parks asserted that:

> In all claims of misrepresentation I claim that defendants made
> misrepresentations not to me, but made misrepresentations to a
> third party.   Nevertheless, I absolutely did rely on the statements
> made to be truthful in all aspects, and suffered as a result if [sic] the
> falseness of said statements.   Which defendant made which
> statement is clear in my Complaint.

Pl. Resp., p. 26.

This "evidence" is insufficient to sustain a claim of intentional misrepresentation.

Even assuming that Parks could establish that the statements by Mickelson, Dooley or

Hendrickson amounted to misrepresentations (e.g. he lied about being sexually

harassed by Haageman, or he lied when he said it was Melde, and not he, who initiated

the conversation about Hagemann), and they intended for him to rely on their

misrepresentations, the plain facts are that Parks never relied on their statements.

Then, and now, he has always maintained he was innocent and that the statements he

had made about Haageman and to Melde were true.  In short, Parks has offered no

---

[32]   The Minnesota Supreme Court has neither adopted nor rejected the tort of
negligent misrepresentation involving physical harm.  Smith v. Brutger, 569 N.W.2d 408,
414 (Minn. 1977).  This Court does not need to consider this issue, since Parks has not
alleged any physical harm resulting from negligent misrepresentation.

facts that <u>he</u> (as opposed to a third party) relied on the alleged misrepresentations by statements by Mickelson, Dooley or Hendrickson in their decisions.  <u>See</u> <u>Rodgers v. City of Des Moines</u>, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, [the court] will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

Having concluded that Parks failed to present facts to make out a claim of misrepresentation, the Court recommends that defendants' motion for summary judgment be granted on this claim.

**V.   SUMMARY**

In summary, Defendants' Motion for Summary Judgment should be granted to this extent:

1.   All claims against Braun, Spiess, Hagemann, Strom, Melde, Lilya, and O'Hara should be dismissed with prejudice;

2.   Parks' Eighth Amendment claims against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice;

3.   Parks' Fourteenth Amendment claims against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice;

4.   Parks' conspiracy claim against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice;

5.   All of Parks' state law claims against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice;

6.   Parks' claims for mental and emotional damages against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice.

7. Parks' request for declaratory relief against Mickelson, Dooley, and Hendrickson should be dismissed with prejudice ;

At the same time, the Court has concluded that defendants' motion for summary judgment regarding Parks' First Amendment claims of retaliatory discipline against Mickelson, Dooley, and Hendrickson stemming from the 2008 and 2009 disciplinary incidents should be denied, and Parks should be permitted to proceed on those claims against these defendants only.  Any potential recovery on these claims against these defendants, shall be limited to actual damages and punitive damages.  <u>See</u> n. 11, <u>supra.</u>

For the reasons set forth above, and based on all the files, records, and proceedings herein, IT IS RECOMMENDED THAT:

The Defendants' Motion to Dismiss or for Summary Judgment  [Docket No. 11] be GRANTED in part and DENIED in part as follows:

All claims described in Parks' Complaint [Docket No. 1] should be dismissed with prejudice, with the exception of Parks' First Amendment retaliatory discipline claims relating to the 2008 and 2009 disciplinary incidents, which may proceed to trial against defendants Mickelson, Dooley and Hendrickson.


February 11, 2011                              s/*Janie S. Mayeron*
                                               Janie S. Mayeron
                                               United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **February 25, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.  Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **February 25, 2011.**